ORIGINAL

FILED IN CLERK'S OFFICE

NOV 1 8 2005

LUTHER D. _____, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* KAMAL MUSTAFA AL-SULTAN, | ) ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| v. | ) ) | Civil Case No. ____ 1 05 - C V 2968 JURY TRIAL DEMANDED |
| THE PUBLIC WAREHOUSING COMPANY--K.S.C. d/b/a PWC LOGISTICS; THE SULTAN CENTER FOOD PRODUCTS COMPANY, K.S.C.; TAREK ABDUL AZIZ SULTAN AL-ESSA; CHARLES TOBIAS SWITZER; and EMAD ALSALEH, | ) ) ) ) ) ) ) ) ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| Defendants. | ) ) | |

-GET

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury upon the claims set forth in the Complaint dated November 18, 2005.

This 18th day of November, 2005.

Respectfully submitted,

**SIMS MOSS KLINE & DAVIS LLP**

By: _____

Raymond L. Moss
Georgia Bar No. 526569
Counsel for Plaintiff/Relator

By: _____

Gerald B. Kline
Georgia Bar No. 425175
Counsel for Plaintiff/Relator

Three Ravinia Drive, Suite 1700
Atlanta, Georgia 30346-2133
Telephone No. (770) 481-7200
Facsimile No. (770) 481-7210
Email: rlmoss@smkdlaw.com
Email: gbkline@smkdlaw.com

_____

Jerome J. Froelich, Jr.
Georgia Bar No. 278150
Special Counsel for Plaintiff/Relator

Two Midtown Plaza
1349 West Peachtree Street, Suite 1250
Atlanta, Georgia 30309
Telephone No. (404) 881-1111
Facsimile No. (404) 881-8040
Email: mckfroe@aol.com

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 1 8 2005 4kpm

LUTHER D. THOMAS, Clerk

By _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA )
*ex rel.* KAMAL MUSTAFA )
AL-SULTAN, )
)
　　　　　　　Plaintiff/Relator, )
)
v. )
)
THE PUBLIC WAREHOUSING )
COMPANY--K.S.C. d/b/a PWC )
LOGISTICS; THE SULTAN CENTER )
FOOD PRODUCTS COMPANY, )
K.S.C.; TAREK ABDUL AZIZ )
SULTAN AL-ESSA; CHARLES )
TOBIAS SWITZER; and EMAD )
ALSALEH, )
)
　　　　　　　Defendants. )
_____)

Civil Case No. **1 05 - C V 2968**
JURY TRIAL DEMANDED

**FILED IN CAMERA AND
UNDER SEAL**

## COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT

COMES NOW Plaintiff, United States of America *ex rel.* Kamal Mustafa Al-Sultan, by and through counsel and alleges the following:



## JURISDICTION AND VENUE

1. The Court has jurisdiction over this civil action seeking relief for violations of the False Claims Act, 31 U.S.C.A. § 3729 et seq., pursuant to 28 U.S.C.A § 1331 and 31 U.S.C.A. § 3732(a), as all Defendants, including the alien Defendants, availed themselves of the opportunity to transact business with the United States of America. Venue is appropriate in this judicial district pursuant to the Alien Venue Act, 28 U.S.C. § 1391(d), as aliens may be sued in any federal district. This action is also commenced pursuant to 28 U.S.C.A. § 1345 in that it is being brought on behalf of the United States.

2. Defendant PWC owns and conducts business in the U.S. through GeoLogistics Americas, an international freight management and logistics company, with significant operations and a 220,000 square foot facility near Hartsfield International Airport in Atlanta. Defendant PWC also conducts business and has clients in the Northern District of Georgia and has recruited employees in Atlanta, specifically in connection with the contracts with the United States Government described herein.

## THE PARTIES

3.      Plaintiff and Relator Kamal Mustafa Al-Sultan ("Plaintiff/Relator") is a resident of Kuwait. Plaintiff/Relator is also the General Manager and controlling person of Kamal Mustafa Al-Sultan Company, WLL ("KMSCO"), a limited liability Kuwait general trading and contracting company that has been the current prime contractor under multiple separate blanket purchase agreements ("BPAs") with the United States Government. Said contracts require the provisioning of camp life support, food products and potable ice for the United States Army at Camp Doha, Kuwait. Plaintiff/Relator brings this civil action under the False Claims Act for himself and for the United States Government pursuant to 31 U.S.C.A. § 3730(b) and also asserts pendent state law claims.

4.      Defendant The Public Warehousing Company—K.S.C ("PWC") d/b/a PWC Logistics is an alien corporation organized and existing under the laws of Kuwait, where it is publicly traded under the securities symbol "WARE" on the Kuwaiti Stock Exchange. PWC transacts worldwide business under various names and divisions, including the trade name "PWC Logistics." At all relevant times herein, PWC has been a prime contractor with the United States Government. PWC has continued to materially transact business with the United States, including the

negotiation and performance of and the receipt of compensation for the prime contracts forming the subject matter of this proceeding. By reason thereof, PWC is subject to the Court's jurisdiction.

5.      Defendant The Sultan Center Food Products Company, K.S.C. ("TSC") is an alien corporation organized and existing under the laws of Kuwait, where it is publicly traded under the securities symbol "Sultan" on the Kuwaiti Stock Exchange. At all relevant times herein, TSC has acted jointly with PWC in the wrongful conduct described herein and is thus subject to the Court's jurisdiction.

6.      Defendant Tarek Abdul Aziz Sultan Al-Essa ("Al-Essa") is a citizen of the United States of America, who currently resides in Kuwait City, Kuwait. At all relevant times herein, Al-Essa has served as PWC's Board Chairman and Managing Director and, as such, has been positioned to direct PWC's business affairs. Al-Essa has also served on TSC's board of directors and, as such, has been positioned to direct its affairs. Al-Essa has acted jointly with PWC in the wrongful conduct described herein and is thus subject to the Court's jurisdiction.

7.      Defendant Charles Tobias Switzer ("Switzer") is a citizen of the United States of America, who currently resides in Kuwait City, Kuwait. At all relevant times herein, Switzer has served as PWC's General Manager of the Prime Vendor Program

- 4 -

and, as such, has been positioned to direct PWC's business affairs. Switzer has acted jointly with PWC in the wrongful conduct described herein and is thus subject to the Court's jurisdiction.

8.      Defendant Emad AlSaleh ("AlSaleh") is a citizen of the United States of America, who currently resides in Kuwait. At all relevant times herein, AlSaleh has served as an employee of PWC and, as such, has acted jointly with PWC in the wrongful conduct described herein and is thus subject to the Court's jurisdiction.

## BACKGROUND FACTS

9.      KMSCO began operations in 1995 in the distribution of automotive and industrial lubricants. Following its formation, KMSCO experienced significant growth, including its appointment as the exclusive Kuwaiti distributor for a lubricants business owned by the Italian government. That distributorship later expanded into the territories of Saudi Arabia, Qatar, Bahrain, Oman and the United Arab Emirates.

10.     Since 1996, KMSCO has partnered with the United States Government in fulfilling critical military supply agreements. Those commitments have included for example, ice provisioning requiring deliveries between Saudi Arabia and Kuwait. Before the events described herein, KMSCO was supplying camp life support, food supplements and ice to the United States Army at Camp Doha in Kuwait and other

locations pursuant to three BPAs. Those BPAs had an estimated annual value of $11.5 million. Because of KMSCO's capabilities and reputation, the United States Army Central Command-Kuwait named Plaintiff/Relator "Best Large Business" in 2002.

11.     PWC markets itself as, and provides global supply chain solutions through, a network of warehousing facilities and transportation trade management services. Its service capabilities assist customers in areas that include apparel and footwear; automotive, consumer, and industrial electronics; consumer package goods; engineering and construction; exhibits and entertaining; food and groceries; and oil and petro chemicals. Before the events described herein, PWC did not provide foodstuff provisioning to the United States Government in Iraq. More particularly, before the events herein described, PWC had not provided the United States Government with the type of services that KMSCO was providing under its BPAs.

12.     Since approximately 2003, as described herein, PWC became involved in substantial ongoing and lucrative military supply arrangements with the United States Government. That strategic involvement directly resulted from Plaintiff/Relator's and KMSCO's efforts and reputation, as described below. Those contracts, which form the subject matter of this Complaint, essentially have consisted of a military "prime vendor contract" (being No. SP0300-03-D-3061, awarded May 28, 2003) (the "First PV

Contract") and a more recent "prime vendor contract" (being No. SPM300-05-D-3128, awarded June 3, 2005) (the "Second PV Contract"). The Second PV Contract functionally is a continuation of the First PV Contract. Said prime vendor contracts are referred to herein collectively as the "PV Contracts" or individually as a "PV Contract," the "First PV Contract," or the "Second PV Contract." A true copy of the First PV Contract is attached as Exhibit "A" and a true copy of the Second PV Contract is attached as Exhibit "B." The PV Contracts have generated in excess of $2,000,000,000.00 in sales for PWC to date and potentially are estimated to generate in excess of $8,000,000,000 in revenues and a contract maximum value in excess of $16,000,000,000 in revenues over the duration of these contracts.

13. The United States Defense Supply Center Philadelphia ("DSCP") is responsible for furnishing various products and services, including foodstuffs, to United States troops stationed in the Middle East.

14. In approximately May 2002, DSCP issued its Solicitation No. SP0300-02-R-4003 (the "2002 Solicitation"). The 2002 Solicitation addressed the award of indefinite delivery/indefinite quantity ("IDIQ") contracts to proposed contractors who could supply food and non-food items to United States troops stationed in the Middle East and other described regions. The 2002 Solicitation's geographic scope included a

newly constituted "Zone III." Zone III encompassed Kuwait and Qatar. The 2002 Solicitation also covered the supplying of "Local Market Products" like dairy, beverage and baked goods.

15. Before the 2002 Solicitation, Kuwait had been included in the "Southern European Zone." Plaintiff/Relator held a BPA in that zone to provide Local Market Products in Kuwait. Iraq was added to the Kuwait and Qatar Zone III after the award of the First PV Contract.

16. Because KMSCO was currently providing Local Market Products to the United States military under its own and other prime vendor BPAs (which included what is now Zone III), KMSCO and Plaintiff/Relator became interested in bidding in response to the 2002 Solicitation.

17. The scope of the 2002 Solicitation extended beyond Local Market Products and Plaintiff/Relator's sole capabilities. Accordingly, KMSCO approached PWC to enter into a partnership that would respond to the 2002 Solicitation.

18. KMSCO and PWC entered into a partnership agreement, dated as of July 30, 2002 and effective as of June 4, 2002 (the "Partnership Agreement") for the purposes of, *inter alia,* bidding on the Zone III component of the 2002 Solicitation and, if successful, performing the resulting prime vendor contract. The Partnership

Agreement allocated a 70% partnership interest to PWC and a 30% interest to KMSCO. Accordingly, PWC controlled all aspects of the Partnership, and consequently, the performance of the PV Contract. A true copy of the Partnership Agreement is attached as Exhibit "C."

19.     The Agreement also provided *inter alia* (i) that the partnership would enter into binding "teaming" agreements to provide the services detailed in the 2002 Solicitation and (ii) that one of the teaming agreements might be with PWC's corporate affiliate, TSC, and other affiliates.

20.     The Partnership Agreement further stipulated that the bid proposal responding to the 2002 Solicitation would be in PWC's name and that if the bid was successful, PWC would be the Prime Vendor contractor-of-record.

21.     PWC, its affiliates and KMSCO acknowledged among themselves that KMSCO, through its existing local supplier relationships and its substantial experience in contracting with the United States Government, would be responsible for coordinating Local Market Products acquisition under the intended PV Contract.

22.     Defendant Al-Essa and members of his immediate family own a majority controlling interest in TSC. TSC owns approximately 30% percent of an entity known as The National Real Estate Company ("NREC"). In turn, NREC owns approximately

30% of PWC's outstanding stock. TSC, PWC and NREC share interlocking directors, who are members of the Al Sultan family, and who exercise common control over those entities. Moreover, the Partnership Agreement provided that three board members would be responsible for all decisions made concerning the entity. PWC appointed Defendants Switzer and AlSaleh as their board designees, and Plaintiff/Relator was designated as the third director. Accordingly, within the Partnership, neither KMSCO nor Plaintiff/Relator had ownership control; and among the team members, KMSCO did not have management control.

23.    On behalf of the Partnership, PWC submitted a proposal responding to the 2002 Solicitation. Said proposal named TSC and KMSCO and also designated TSC and NREC as "team members." A true copy of said proposal is attached as Exhibit "D."

24.    As to KMSCO, the proposal stated, "Mr. Kamal Sultan will have primary responsibility for insuring the quality provisioning of all market ready (BPA) provisioning." The proposal reflected that PWC and its team members relied heavily on Plaintiff/Relator's and KMSCO's past experience in selling to the United States military. For example, in answering the 2002 Solicitation's request for information regarding "relevant experience," PWC listed only one prior United States Army

contract valued at merely $1 million. In contrast, KMSCO listed three military contracts worth more than $11 million. By specifically citing to Plaintiff/Relator's and KMSCO's prior dealings and reputation with the military and Plaintiff/Relator's critical intended role in the Partnership, PWC sought to induce the United States Government to act favorably upon the bid proposal.

25. On May 28, 2003, DSCP awarded PWC the First PV Contract for Zone III (No. SP0300-03-D-3061). The First PV Contract has been subsequently modified in various respects. The First PV Contract expressly incorporated the Partnership's proposal.

26. The First PV Contract identified 90 different core food items. Its critical purpose was to feed United States military troops stationed in Iraq and Kuwait. Said PV Contract's estimated first year value to PWC was $22,392,904.00, and its maximum ceiling for the base year and four one-year option periods in the aggregate was $1,455,473,760.

27. As of the date of this Complaint, the First PV Contract has been modified 36 times for various reasons since its award date. Those modifications have included the addition of administrative support contracts, incorporation of BPAs, subsequent modifications to those contracts and BPAs, changes in fiscal years, changes to original

specified ordering or delivery requirements, option year renewals and creation and award of a new contract. The modifications appear on the contracts listed in Exhibit "E" attached hereto and incorporated herein by reference.

28. Additionally, Contract Number SPM300-05-D-3119 was awarded to PWC pursuant to Modification P00036 to the PV Contract for the period February 16, 2005 through December 15, 2005 for the estimated value of $1,090,436,158. Said contract modified the First PV Contact. The total amount paid or to be paid to PWC per the First PV Contract exceeds $2,545,000,000.00. A true copy of said Modification P00036 is attached as Exhibit "F." The estimated value to be paid to PWC per the Second PV Contract exceeds $4,600,000,000 and the maximum contract value of the PV Contracts exceeds $16,000,000,000.

29. Contract pricing under the First PV Contract (and now, under the Second PV Contract) was based on the following formula: cost of goods paid by the Prime Vendor Contractor to the supplier/manufacturer ("Delivered Price") + a pre-established fixed distribution fee established at a dollar amount ("Distribution Fee") = unit sale price to the United States Government ("Unit Price"). The First PV Contract at pages 3-4 stated that the Distribution Fee was to cover the prime vendor contractor's projected general and administrative expenses, overhead, profit, packaging, costs,

transportation cost, and any other projected expenses associated with the distribution function. The Distribution Fee represented the only amount that the prime vendor contractor was contractually allowed to add to the actual invoice price it paid to the manufacturer or supplier of goods purchased by the prime vendor contractor for each item. The Distribution Fee for the "food categories" covered by the First PV Contract is set forth at pages 5-6 of thereof. These Fees have not been amended or changed during PWC's performance of the First PV Contract.

30. The PV Contract for Zone III required the Zone III prime vendor contractor to purchase perishable products on the local market. Those Local Market Products included fresh fruits and vegetables; "market ready" products (like fresh bakery items, dairy products, bottled water and soda, or eggs); and other perishable products. In all other military zones, the United States Government itself purchased those products and provided them to the prime vendor contractor as government-furnished material for distribution and delivery to the military units. As demonstrated below, the Defendants have exploited and continue to exploit this distinctive feature of the First and Second PV Contracts through their wrongful conduct.

31. Shortly after the First PV Contract was awarded to PWC, DSCP began placing orders with it for Local Market Products. PWC concurrently asked KMSCO to

fill said orders. PWC's reasons for doing so were three-fold: (i) it wanted to take advantage of KMSCO's long-established and fair pricing relationships with local suppliers; (ii) in the initial stages of performing the PV Contract, TSC had failed to dedicate the expected resources to the PV Contract; and (iii) PWC had not yet reached a final arrangement with TSC on its role in performing the PV Contract.

32.    During discussions among Plaintiff/Relator, PWC's representatives (including the individually named Defendants) and TSC in the June/July 2003 time period, PWC announced that it expected KMSCO to buy Local Market Products and then invoice PWC at Plaintiff/Relator's sales prices (i.e., cost of goods plus overhead and profit) rather than at KMSCO's costs of goods, as the First PV Contract stipulates. PWC stated that it would take the higher KMSCO sales price, add it to the Distribution Fee and then invoice the United States Government, using the inflated price. Under PWC's announced fraudulent scheme, the inflated portion of the price (i.e., KMSCO's overhead and profit factor) would be shared in some manner between PWC and Plaintiff/Relator.

33.    Plaintiff/Relator, as KMSCO's General Manager, refused to participate in this announced scheme. The remaining Defendants asserted no objection to PWC's

announced intention to defraud the United States Government in performing the PV Contract.

34.     The Partnership Agreement allowed any of its parties to pre-approve any arrangement or transaction between another partner thereto or that partner's affiliates. Because of the common ownership, control and interest between PWC and TSC, Plaintiff/Relator and KMSCO further opposed PWC's announced scheme. Plaintiff/Relator recommended a proposal in keeping with the PV Contract's invoicing terms:  TSC, a supplier for Local Market Products, would: (i) take advantage of KMSCO's existing arrangements with local suppliers and buy the products at KMSCO's negotiated prices with those suppliers under KMSCO's existing BPAs, as those prices were below the prices TSC paid for products used in its supermarket operations, (ii) use the supplier invoices (i.e., costs of goods) as the basis for selling the products to PWC, as the PV contracting entity, without marking up for overhead, G&A, profit etc. (collectively the "Margin") and (iii) share with the Partnership, the distribution fees the Partnership would receive on the Local Market Products sold to the United States Government.  Plaintiff/Relator and KMSCO believed that this approach was fair, reasonable and equitable to all parties and would result in lower Unit Prices to the United States Government.

35.     Defendants PWC and TSC flatly rejected Plaintiff /Relator's proposal. Defendants PWC and TSC insisted on using TSC's own selling price, even though it was higher than the pricing that was proposed by Plaintiff/Relator or otherwise available in the marketplace; and PWC and TSC wanted to add TSC's own margin to the actual cost of the goods and for TSC to keep it for itself. Moreover, PWC conceived that PWC would enter into a "service agreement" with TSC whereby PWC, not TSC, would provide logistical support and assistance to TSC. Concomitantly, TSC would pay PWC for those services and then add that service cost factor as part of TSC's margin in its invoices to PWC as the PV Contractor. This additional component of PWC's fraudulent scheme would result in substantial, ongoing and unlawful compensation to PWC in each invoice it submitted to the United States Government. The scheme would also substantially and unlawfully increase the cost of goods upon which TSC would base its profit, with the United States Government paying a grossly inflated and materially unfair Unit Price, which included the Distribution Fee.

36.     Plaintiff/Relator also objected to and rejected these components of the fraudulent scheme as well. Plaintiff/Relator believes that the primary motivation for Defendant Al-Essa and his subordinates to utilize TSC was so he and his immediate

family, who had a majority controlling ownership in TSC, could personally reap substantial financial gain from the PV Contracts.

37.     At all relevant times, TSC's inflated selling prices have been higher than KMSCO's prices for such goods or prices otherwise available for purchase directly from readily available, non-affiliated third-party suppliers.  Moreover, TCS, a supermarket chain, does not have the capability (as Plaintiff/Relator does) to inspect the products at the distribution points.  In this scheme, TSC places orders for Local Market Products and other products directly with the suppliers.  PWC then requires the suppliers to deliver the products to the loading docks at the Fresh Fruits Company (one of the designated suppliers that has a large loading dock or other vendors, such as the Soma International Fruit Company).  Once delivered by the various suppliers, PWC, not TSC, picks up the products from the Fresh Fruits Company or other vendors and transports them to PWC's own distribution points in Iraq and other countries served under the PV Contracts.  Under this scenario, there is no justifiable reason at all for PWC to even contract with TSC, as the goods are picked-up directly from third-party suppliers, and TSC provides no meaningful service other than ordering and invoicing PWC for these goods at an inflated price, which is well in excess of market prices. Nor does TSC obtain more favorable pricing from suppliers and vendors than are

otherwise readily available in the marketplace. The purpose and effect of this arrangement between PWC and TSC is a paper shuffling ruse to benefit TSC and its majority owners (who include Defendant Al-Essa and his immediate family), like Defendant Al-Essa, and, more importantly, to defraud the United States Government.

38.    Plaintiff/Relator refused to participate in this proposed fraudulent scheme engineered between PWC and TSC. On July 30, 2003, he sent an e-mail to PWC stating: "Further KMSCO is not in agreement with any of the PV JV dealing with intent to inflate prices to DSCP. As PV JV is managed by PWC staff without our agreement, any consequence will be that of PWC alone." A true copy of said email is attached as Exhibit "G.

39.    Shortly after said email, PWC transferred responsibility for the supply of the Local Market Products from KMSCO to TSC.

40.    When PWC stripped KMSCO of its responsibility for supplying Local Market Products and transferred the same to TSC, PWC knew that (i) TSC, its corporate affiliate, was unable to serve as a true supplier within the scope of the PV Contract, (ii) TSC, a supermarket chain, did not have the capacity to inspect and provide the assets to deliver the subject products to the military's required distribution

points, and (iii) TSC knew that PWC could get better pricing if they went through Plaintiff/Relator or directly to the actual suppliers of Local Market Products.

41.    Once KMSCO refused to participate in the unlawful arrangement that was struck among the Defendants, PWC effectively excluded KMSCO from any aspect of the PV Contract.

42.    Later in 2003, PWC unilaterally declared the Partnership Agreement terminated. Neither Plaintiff/Relator nor KMSCO has ever received any financial benefits from the aforementioned fraudulent scheme.

43.    Actual invoices analyzed by Plaintiff/Relator, demonstrate that the Defendants have implemented their fraudulent scheme and have employed and are continuing to employ the same unlawful and fraudulent pricing and excessive mark-ups arrangement or variants thereof that Plaintiff/Relator rejected, to systematically bilk the United States Government under the PV Contracts.

44.    As previously asserted, the PV Contracts clearly established the formula from which Local Market Product articles are to be priced. The contractual Delivered Price is the actual cost of the item plus the Distribution Fee. The contractual Distribution Fee (unit price), which is fixed, includes all other elements of the Unit Price, including G&A, profit, overhead, packaging costs, and transportation costs.

45.     Plaintiff/Relator's review of actual invoices against the costs charged on the various Local Market Products by product manufacturers, vendors and suppliers verifies that Defendants have excessively marked up the invoices to the United States Government. By way of example only, Plaintiff/Relator's sampling analysis of 28 PWC-submitted invoices between March and August 2005 reveals PWC overcharges of as high as twenty six percent (26%) on that invoice sampling. See spreadsheet Summary appearing as Exhibit "H," attached hereto and expressly incorporated herein by reference.

46.     To conduct his analysis, Plaintiff/Relator procured invoice quotes from many of the local vendors and suppliers of Local Market Products utilized by TSC. Plaintiff/Relator then compared those prices "by product" to the line item products enumerated on PWC's invoices selected for the invoice sampling. Said analysis specifically demonstrates the fraudulent arrangements among the Defendants to overcharge the United States Government on supplied Local Market Products.

47.     By example, Plaintiff/Relator analyzed PWC Invoice Number 022502 dated April 5, 2005, in the amount of $45,587.27 to DSCP. That analysis and comparison of PWC's excessive charges as to Local Market Product costs appears as Exhibit "I-1," which is attached hereto and expressly incorporated herein by reference.

PWC's Invoice Number 022502 is attached hereto and expressly incorporated herein as Exhibit "I-2." Exhibit "I-1" analyzes each line item product "cost" reflected on PWC's Invoice 022502 to Local Market Product costs that Plaintiff/Relator obtained from local vendors and suppliers. That line item analysis depicted in Exhibit "I-1" reflects line item percentage overcharges as high as three digits. For Invoice Number 022502, Exhibit "I-1" reflects a total dollar overcharge of $4,694.69, corresponding to a percentage overcharge to the United States Government of sixty-four percent (64%) on all Local Market Products charged on that invoice. Said dollar and percentage calculations are reflected at Line 11 of Exhibit "H."

48. By way of further example, Plaintiff/Relator analyzed PWC Invoice Number 24226, dated May 31, 2005, in the sum of $71,982.12 to the DSCP. Plaintiff/Relator's line item analysis of Local Market Products charged in said invoice is attached hereto and expressly incorporated herein as Exhibit "J-1"; and said invoice is attached hereto and expressly incorporated herein as Exhibit "J-2." That line item analysis depicted in Exhibit "J-1" reflects line item percentage overcharges as high as three digits. Exhibit "J-1" reflects a total dollar overcharge of $6,384.56, corresponding to a percentage overcharge of sixty percent (60%) to the United States

Government on all Local Market Products charged on that invoice. Said dollar and percentage calculations are reflected at Line 9 of Exhibit "H."

49.    By way of further example, PWC submitted Invoice Number 25446, dated June 16, 2005, in the sum of $58,386.30 to DSCP. Plaintiff/Relator's comparative analysis of that invoice to Local Market Product costs appears as Exhibit "K-1," which is attached hereto and expressly incorporated herein by reference; and Invoice Number 25446 is attached hereto and expressly incorporated herein as Exhibit "K-2." That line item analysis depicted in Exhibit "K-1" reflects line item percentage overcharges as high as three digits. The analysis reflects PWC's overcharges to the United States Government in the dollar amount of $6,976.69, corresponding to an aggregate sixty two percent (62%) overcharge on the invoice. Said dollar and percentage calculations are reflected at Line 28 of Exhibit "H."

50.    Further demonstration of PWC's fraudulent and excessive overcharging appears in connection with its Invoice Number 29389, dated August 23, 2005, in the sum of $207,874.39. Plaintiff/Relator's line item analysis of Local Market Products charged in said invoice appears as Exhibit "L-1," which is attached hereto and expressly incorporated herein by reference; and said invoice is attached hereto and expressly incorporated herein as Exhibit "L-2." Exhibit "L-1" reflects that PWC

overcharged the United States Government as high as a three digit percentage factor on particular Local Market Product items reflected on said invoice. Exhibit "L-1" further reflects a total dollar overcharge of $11,675.76, corresponding to a percentage overcharge of sixty two percent (62%) to the United States Government on all Local Market Products charged on that invoice. Said dollar and percentage calculations are reflected at Line 19 of Exhibit "H."

51. During part of July 2003, and before PWC terminated its involvement, KMSCO ordered Local Market Products for the First PV Contract. TSC performed no active role other than invoicing PWC for the goods at a higher price and paying vendors for the goods. Plaintiff/Relator has not seen PWC's invoices submitted to the United States Government during the early part of the First PV Contract. However, he has reviewed certain 2003 invoices TSC submitted to PWC for Local Market Products and compared said invoices to KMSCO's costs and those costs of other third party vendors and suppliers. Analysis of said invoices further demonstrates Defendants' fraudulent conduct.

52. In particular, Plaintiff/Relator analyzed twenty-five TSC invoices covering merely a two-week period in July 2003 when the First PV Contract was ramping up. That analysis, a true copy of which is attached hereto and expressly

incorporated herein as Exhibit "M," reflects that TSC charged PWC 245,104.33 Kuwait Dinars (approximately US$839,369.66) for Local Market Products that KMSCO ordered in those various invoices. However, according to then existing prices of Local Market Product vendors/suppliers, PWC could have procured the same products from the same vendors for approximately 180,045.92 Kuwait Dinars (approximately US$616,574.51). Accordingly, early on in PWC's and TSC's unlawful arrangement with one another, the United States Government sustained an unnecessary approximately 65,058.41 Kuwait Dinars (approximately US$222,785.15) overcharge upon which PWC in turn added its Distribution Fee.

53.     For example, on July 4, 2003, TSC presented its Invoice Number 7 to PWC in the sum of 5,860.00 Kuwait Dinars (approximately US$20,068.49). A true copy of said invoice is attached hereto and expressly incorporated herein as Exhibit "N." The invoice reflects subcharges as follows: (i) chocolate milk, 1,483.20 Kuwait Dinars (approximately US$5,079.45) for 600 cases; (ii) low fat white milk, 2,966.40 Kuwait Dinars (approximately US$10,158.90 for 1,200 cases; and (iii) strawberry milk, 1,411.20 Kuwait Dinars (approximately US$4,832.88) for 600 cases.

54.     KMSCO's corresponding July 2003 unit prices for said dairy products from Local Market Product vendors/suppliers are reflected at Exhibit "O," attached

hereto and expressly incorporated herein. Said exhibit shows that PWC could have obtained said items from local vendors and suppliers for 4,320.00 Kuwait Dinars (approximately US$1,261.44), a savings of approximately thirty-six percent (36%) versus TSC's 5,860.00 Kuwait Dinars (approximately US$20,068.49) inflated charge to its affiliate.

55. PWC advanced its scheme in other ways. To give the "appearance" of adding alleged value to the procurement process, PWC caused the Fresh Fruits Company, a Local Market Products vendor/supplier, and certain other suppliers, to (i) affix labels on local market ready items, reflecting TSC's logo, and (ii) perform other duties such as receiving, inspecting, counting and wrapping those market ready items. Fresh Fruits Company's loading docks have been used as a collection point for market ready items that are delivered by the suppliers pursuant to the PV Contracts. Those labels perpetuated the myth and fraudulent scheme that TSC performed actual services in connection with the procurement of local market ready items.

56. Following the false labeling, PWC--not TSC--inspected the products. Thereafter, PWC, not TSC, used its transports to pick up the fraudulently labeled items (which are the vendor/suppliers' products, not TSC's) for further distribution and delivery by PWC. Said products had already been delivered to the Fresh Fruits

Company, and certain other suppliers, for collection. Within that scheme, TSC's employees never handled the Local Market Products yet the products were "passed off" as having been handled by TSC.

57.    Based on experience and knowledge derived from his own BPAs, through KMSCO's Local Market Product activities and the PV Contracts' requirements, Plaintiff/Relator projects that PWC has submitted in excess of 2,000 invoices to the United States Government since the inception of the First PV Contract in 2003.

58.    Because PWC's invoices to DSCP have reflected only the final Unit Price, the Defendants have systematically concealed the fraudulent mark-up scheme from the United States Government. When DSCP receives PWC's periodic daily and weekly invoices—consistent with the PV Contract's terms--DSCP bases its payments on the understanding that the Delivered Price imbedded in the Unit Price only includes the supplier's actual invoice price and the Distribution Fee. PWC's continuing invoices to the United States Government do not reveal and moreover, intentionally conceal, that TSC is artificially inflating the prices that it charges. Said conduct constitutes false claims and false statements to the United States Government.

59.    Moreover, the PV Contracts require PWC to warrant that the Unit Prices it charges the United States Government are less than or equal to the unit prices it

charges to its most favored commercial or government customer for similar quantities under comparable terms and conditions. Said contracts further require PWC to pass on all rebates and discounts to the United States Government. At all relevant times, PWC knew that (i) KMSCO's available Local Market Product prices were lower than those offered by TSC, (ii) utilizing KMSCO's prices and business practices would comply with the PV Contracts' terms, (iii) TSC's invoice prices were grossly inflated and were well in excess of actual local market prices, and (iv) TSC was not providing any meaningful service and its primary role was to inflate the Delivery Price and the Unit Price. Acting in concert with the remaining Defendants, PWC has collusively and intentionally deprived the United States Government of the benefit of KMSCO's pricing and further, fraudulently inflated the contractual costs, depriving the United States Government more favorable costs readily available through other capable suppliers.

60. Moreover, TSC's participation adds no real value other than to unlawfully enrich itself and its owners (including Defendant Al-Essa), who sit on the Board of Directors of and control PWC. PWC could have purchased the Local Market Products directly from the vendors and significantly reduced the Final Unit Price paid by the United States Government.

61.     Through the foregoing wrongful conduct, PWC has presented substantial and continuing false claims for payment to the United States Government. Plaintiff/Relator approximates said false claims to be at least $200,000,000.00 to date subject to proof obtained during the course of this proceeding.

62.     By reason of the Defendants' wrongful conduct, the United States Government has unwittingly and unknowingly paid PWC's false and inflated invoices.

63.     In addition to being Chairman and Managing Director (effectively the CEO) of PWC, Defendant Al-Essa and members of his immediate family are also controlling TSC shareholders. Al-Essa has participated in, directed, supervised and profited from the false claims submitted to the United States Government.

64.     Not only have Defendants promoted false claims for payment to the United States Government, under First PV Contract (awarded May 28, 2003), but also Defendants are preparing to present false claims for payment to the United States Government, under the Second PV Contract, using the same scheme and/or set of transactions as described above.

65.     Given Defendants' conduct, Plaintiff/Relator has a reasonable basis to conclude that they have perpetuated and extended their fraudulent scheme into

overcharging for other contractually required items pursuant to the PV Contracts beyond Local Market Products.

## COUNT I

### False Claims Act– Presentation of False Claims
### (By Plaintiff/Relator Against All Defendants)
### 31 U.S.C. § 3729(a)(1)

66.     Paragraphs 1 through 65 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

67.     Defendant PWC with the participation, aid and assistance of the remaining Defendants, has knowingly presented or caused to be presented false or fraudulent claims for payment to the United States Government pursuant to the PV Contracts, including, but not limited to, invoices or demands for payment, which have included substantial fictitious and fraudulent overcharges to the United States Government that were unauthorized or inflated by reason of the conduct described in the foregoing paragraphs, all in violation of 31 U.S.C. § 3729(a)(1).

68.     The United States Government has paid the unauthorized or inflated claims to Defendant PWC; and PWC's co-Defendants have profited along with PWC by reason of said claims. As a result of the conduct alleged in this Count for relief, the United States Government has been damaged in an amount exceeding $200,000,000.00

to date. Pursuant to 31 U.S.C. § 3729(a), the United States Government *ex rel.* Plaintiff/Relator is entitled to recover from Defendants, three times the amount of damages which it has sustained by reason of such claims, in excess of $600,000,000.00. The United States Government *ex rel.* Plaintiff/Relator is further entitled to recover from the Defendants, a civil penalty of $10,000.00 for each false claim submitted by PWC and its co-Defendants in an amount to be determined at trial pursuant to 31 U.S.C.A. 3729(a).

## COUNT II

### False Claims Act – Use of False Statements
### (By Plaintiff/Relator against All Defendants)
### 31 U.S.C. § 3729(a)(2)

69.     Paragraphs 1 through 68 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

70.     Plaintiff/Relator is informed, maintains, and alleges that Defendant PWC with the participation, aid and assistance of the remaining Defendants, made or used, or caused to made or used, false records, invoices, or statements within the meaning of 31 U.S.C. § 3729(a)(2) to get the United States Government to pay or approve the false claims for payment pursuant to the PV Contracts, as alleged in this Count for relief.

Plaintiff/Relator is currently unaware of the number of such false statements, but will prove such number at trial.

71.    Each false claim and statement alleged in this Count for relief was knowingly presented, made, or used as the term "knowingly" as defined in 31 U.S.C. § 3729(b), in that Defendant PWC and its co-Defendants had actual knowledge that the information presented to the United States Government in connection with such false claims and statements was incorrect, or they acted in deliberate ignorance or in reckless disregard in the truth or falsity of such information.

72.    As a result of the false claims alleged in this claim for relief, the United States Government was damaged in an amount exceeding $200,000,000.00 to date. Pursuant to 31 U.S.C. § 3729(a), the United States Government *ex rel.* Plaintiff/Relator is entitled to recover from Defendants, three times the amount of damages which it sustained by reason of such claims, in excess of $600,000,000.00. Pursuant to 31 U.S.C. § 3729(a), the United States Government *ex rel.* Plaintiff/Relator is also entitled to recover from Defendants, a civil penalty of $10,000.00 for each false claim alleged in this claim for relief. Plaintiff/Relator is currently unaware of the number of false claims presented by the Defendants but will prove such number at trial.

## COUNT III

### False Claims Act (Conspiracy)
### (By Plaintiff/Relator against all Defendants)
### 31 U.S.C. § 3729(a)(3)

73.     Paragraphs 1 through 72 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

74.     As set forth herein, Defendants and certain of their respective controlling persons, employees and officers, agreed, conspired, and had a tacit understanding to defraud the United States Government in order to get false or fraudulent claims paid by the United States Government pursuant to the PV Contracts, in violation of 31 U.S.C. § 3729(a)(3).   In furtherance of this conspiracy, Defendants and certain of their employees took substantial steps, as set forth above, to effect the objects of the conspiracy alleged herein.

75.     At all relevant times, Al-Essa knew about, advanced and conspired in directing and perpetuating the fraudulent conduct between PWC and TSC in his roles as PWC's Chairman, PWC's Managing Director and TSC's board member.

76.     At all relevant times, Switzer knew about, advanced and conspired in directing and perpetuating the fraudulent conduct in his supervisory role as PWC's General Manager and as a member of the Board of Directors of the Partnership.

77. At all relevant times, AlSaleh knew about, advanced and conspired in directing and perpetuating the fraudulent conduct in his role as an employee of PWC and member of the Board of Directors of the Partnership whose duties included day-to-day responsibility and decision-making for the administration of the PV Contracts in association with Defendant Switzer.

78. At all relevant times, TSC knew about, advanced and conspired in directing and perpetuating the fraudulent conduct. TSC has continued to profit from the fraudulent conduct by (i) directly receiving substantial, continuing payments from PWC for its own overcharges and (ii) indirectly profiting from the overcharges PWC continues to collect, in TSC's position as a shareholder of NREC, which in turn is an equity owner in PWC.

79. As a result of Defendants' conspiring, agreeing, and having a tacit understanding with each other, and with affected entities, persons, and employees, to submit false, fraudulent, and inflated invoices to the United States Government, the United States Government paid PWC based on these false claims. The remaining Defendants, as affiliated entities, owners, and/or controlling persons and employees who participated with PWC in its wrongful conduct, all directly or indirectly obtained monies and/or other benefits as a result of this conspiracy.

80.     As a result of the false claims and conspiracy alleged in this Count for relief, the United States Government was damaged in an amount exceeding $200,000,000.00 to date.   Pursuant to 31 U.S.C. § 3729(a), the United States Government *ex rel.* Plaintiff/Relator is entitled to recover from Defendants, three times the amount of damages which it has sustained by reason of such claims, in excess of $600,000,000.00.  Pursuant to 31 U.S.C. § 3729(a), the United States Government *ex rel.* Plaintiff/Relator is also entitled to recover from Defendants, a civil penalty of $10,000.00 for each false claim alleged in this claim for relief.  Plaintiff/Relator is currently unaware of the number of false claims presented by the Defendants but will prove such number at trial.

81.     By reason of these payments, the United States Government has been damaged in an amount to be determined at trial.

## COUNT IV

### Breach of Contract
### (By Plaintiff/Relator Against All Defendants)

82.     Paragraphs 1 through 81 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

83.    Defendant PWC with the participation, aid and assistance of the remaining Defendants breached the PV Contracts with the United States Government by systematically failing to submit accurate and uninflated claims for payments.

84.    The United States Government, acting in justifiable reliance on Defendant PWC's representations, which are material to the PV Contracts, awarded the PV Contracts to Defendant PWC.

85.    The United States Government has continuously paid Defendant PWC monies for items which PWC and its co-Defendants were not contractually entitled to charge pursuant to the PV Contracts.

86.    The United States Government has continuously paid Defendant PWC monies for excessive charges that PWC and its co-Defendants improperly imposed and invoiced in breach of the PV Contracts.

87.    By reason of Defendants' breaches of the PV Contracts, the United States Government has been damaged in an amount to be determined at trial.

## COUNT V

### Payment Under Mistake of Fact
### (By Plaintiff/Relator Against All Defendants)

88.    Paragraphs 1 through 87 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

89.    The United States Government awarded the PV Contracts to Defendant PWC and made inflated payments to Defendant PWC on claims arising from such contracts.

90.    The United States Government made said inflated payments in reliance on Defendant PWC's representations, which were given with the participation, aid and assistance of the remaining Defendants. The United States Government was unaware that PWC's and its co-Defendants' representations were false.

91.    Defendant PWC's and its co-Defendants' representations were material to the award of the PV Contracts and material to the continuing payments made under the PV Contracts. By reason of the foregoing, the United States Government has been damaged in an amount to be determined at trial.

## COUNT VI

### Unjust Enrichment
### (By Plaintiff/Relator against all Defendants)

92.    Paragraphs 1 through 91 of this Complaint are hereby expressly incorporated herein by reference as if the same were fully set forth hereinafter.

93.    By reason of the United States Government's payments under the PV Contracts, Defendants have received monies to which they were not entitled and have thereby been unjustly enriched to the detriment of the United States Government in an amount to be determined at trial.

94.    Defendants must disgorge said monies.

WHEREFORE, Plaintiff/Relator PRAYS for judgment as follows:

(a)    On Count I (False Claims Act – Presentation of False Claims), against Defendants, jointly and severally, for damages trebled, in an amount to be determined at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(b)    On Count II (False Claims Act – Use of False Statements), against Defendants, jointly and severally, for damages trebled, in an amount to be determined

at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(c)    On Count III (False Claims Act - Conspiracy), against all Defendants, jointly and severally, for damages trebled, in an amount to be determined at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(d)    On Count IV (Breach of Contract), against all Defendants, jointly and severally, for damages, in an amount to be determined at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(e)    On Count V (Payment Under Mistake of Fact), against all Defendants, jointly and severally, for damages, in an amount to be determined at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(f)    On Count VI (Unjust Enrichment) against all Defendants, jointly and severally, for damages, in an amount to be determined at trial, and civil penalties as allowed by law, together with costs, including the cost of investigation and interest.

(g)    An award to Plaintiff/Relator of the maximum amounts allowed pursuant to U.S.C.A. § 3730(d) and other applicable statutes and rules.

(h)     An award to Plaintiff/Relator for all costs and expenses of this action, including attorney's fees; and

(i)     All such other and further relief in favor of the United States of America and Plaintiff/Relator as the Court may deem just, proper and equitable.

**A JURY TRIAL IS DEMANDED UPON ALL ISSUES SO TRIABLE PURSUANT TO RULE 38, FEDERAL RULES OF CIVIL PROCEDURE**

This 18th day of November, 2005.

Respectfully submitted,

SIMS MOSS KLINE & DAVIS LLP

By: _____
Raymond L. Moss
Georgia Bar No. 526569
Counsel for Plaintiff/Relator

By: _____
Gerald B. Kline
Georgia Bar No. 425175
Counsel for Plaintiff/Relator

Three Ravinia Drive, Suite 1700
Atlanta, Georgia 30346-2133
Telephone No. (770) 481-7200
Facsimile No. (770) 481-7210
Email: rlmoss@smkdlaw.com
Email: gbkline@smkdlaw.com

_Jerome Froehich_ Ron

Jerome J. Froelich, Jr.
Georgia Bar No. 278150
Special Counsel for Plaintiff/Relator

Two Midtown Plaza
1349 West Peachtree Street, Suite 1250
Atlanta, Georgia 30309
Telephone No. (404) 881-1111
Facsimile No. (404) 881-8040
Email: mckfroe@aol.com