IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel*. KAMAL AL-SULTAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PUBLIC WAREHOUSING | ) | No. 1:05-CV-2968-GET |
| COMPANY, K.S.C., a/k/a AGILITY, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| AND | ) | |
| | ) | |
| THE SULTAN CENTER FOOD | ) | |
| PRODUCTS COMPANY, K.S.C., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT IN INTERVENTION OF THE UNITED STATES OF AMERICA**

Plaintiff, the United States of America, alleges as follows:

**I.   OVERVIEW**

1.   This is an action brought by the United States to recover damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and to recover all available damages for common law fraud, payment under mistake of fact, unjust enrichment, and breach of contract.  All of the false claims and statements at issue in this action were made or caused by Defendants in connection with three contracts between The Public Warehousing Company, K.S.C. ("PWC") and the United States, operating through the Defense Supply Center Philadelphia ("DSCP").  Under these three contracts, PWC agreed to serve as the "prime vendor" (*i.e.*, a commercial distributor of products to

-1-

Federal customers within a geographical region) for the provision of food products and related services (collectively referred to as "subsistence items") to the United States military operating in various countries in the Middle East.

2.   In this action, the United States alleges that from 2003 through the present, PWC, as the prime vendor for subsistence items supplied to the United States military in the Middle East, engaged in two schemes resulting in the presentation of false and fraudulent claims for payment to the United States.

**Overview of Scheme 1: Inflated Invoices for LMRI**

3.   In the first scheme, PWC billed DSCP falsely inflated prices for perishable items and "local market ready items" (collectively "LMRI"), such as fresh fruits and vegetables, dairy products, frozen foods, bakery items, and bottled water and soda, procured in the geographical region served by the prime vendor contracts.  It did so by inflating the "Delivered Price" for LMRI products.  The prime vendor contracts require PWC to bill DSCP a Unit Price, which is comprised of two components -- the Delivered Price and the Distribution Price.  The Delivered Price is to equal the manufacturer/supplier's actual invoice price to deliver the product to the Government's overseas distribution point.  The Distribution Price represents an additional charge to cover PWC's costs, over and above the Delivered Price, plus an allowance for a profit.

-2-

4.   When PWC received orders from DSCP for LMRI, PWC typically called upon The Sultan Center Food Products Company, K.S.C. ("TSC") to fill those orders.  When PWC called upon TSC to fill orders for LMRI, TSC purchased the LMRI primarily from local manufacturers and suppliers in the region.  The local manufacturers and suppliers that provided LMRI to TSC were the actual "manufacturers/suppliers" for purposes of determining the Delivered Price.  TSC substantially marked up LMRI prices over and above what it had paid local manufacturers/suppliers on its invoices to PWC.  PWC then used TSC's inflated LMRI prices as the Delivered Price on its invoices to DSCP.  PWC knew that TSC's prices were not the prices that TSC had paid to manufacturers and suppliers, and therefore, that TSC's prices were not the Delivered Price that the prime vendor contracts allowed it to charge DSCP.  PWC further knew that TSC was not a manufacturer or supplier of LMRI, with the exception of certain bakery products. Any services that TSC provided to PWC for the prime vendor contracts were in the form of consolidation and distribution services, and such services were compensable to PWC through the contract Distribution Price and not the Delivered Price.

5.   PWC also had agreed with TSC that it would pay (and in fact did pay) 10 percent less than TSC's invoiced price for LMRI. PWC had a similar arrangement with another vendor, Jordan Global. PWC never disclosed these 10 percent discounts or rebates to

-3-

DSCP, nor did it return the 10 percent discounts or rebates to
DSCP.  The Delivered Price that PWC charged to DSCP for LMRI
purchased through TSC and Jordan Global included amounts to cover
the 10 percent of invoice that was rebated to PWC.

6.    By manipulating the Delivered Price for LMRI that PWC
billed to DSCP, PWC and TSC submitted, or caused to be submitted,
respectively, false and fraudulent claims for payment to the
United States, which the United States paid.

### Overview of Scheme 2: Overcharges Because of
### Failure to Disclose and Return Discounts to DSCP

7.    In the second scheme, PWC failed to report and return
to DSCP various discounts, allowances and rebates that PWC
negotiated with many of its vendors located within the
Continental United States ("CONUS"), as the prime vendor
contracts required PWC to do.

8.    Instead, PWC took steps to conceal those price
discounts from DSCP to avoid returning them to DSCP.  For
instance, PWC encouraged certain vendors to falsely denominate
discounts attributable to sales as "prompt pay" discounts, and
urged vendors to remove from their invoices to PWC any reference
to the discount.  As a result of PWC's conduct and
misrepresentations, the United States paid falsely and
fraudulently inflated prices for subsistence products that failed
to properly reflect the value of discounts, allowances and
rebates provided by PWC's vendors.

-4-

## II.  JURISDICTION

9.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§3729 and 3730.

10.  The Court has personal jurisdiction over Defendants by virtue of their contacts with the United States which confirm that (a) each has purposefully availed itself of the benefits and protections of the United States through "minimum contacts" with the United States and (b) the exercise of jurisdiction over each defendant does not offend traditional notions of fair play and substantial justice.  The following subparagraphs provide non-exclusive examples of each defendant's contacts with the United States.

(a)  <u>PWC</u>:  Beginning in at least 2003 and continuing to the present, PWC has entered into and/or continues to perform contracts with the United States Government for a broad range of services for the U.S. military and other personnel, including three prime vendor contracts for subsistence items for the U.S. military in the Middle East.  PWC has submitted claims, through the Defense Finance and Accounting Service ("DFAS") in Columbus, Ohio ("DFAS-Columbus"), and the United States to date has paid in excess of $9.8 billion in claims for goods and services under the prime vendor contracts at issue in this Complaint, and the United States continues to pay PWC under the current prime vendor

-5-

contract.  Further, PWC leased office space in Winchester,
Virginia, from at least October 1, 2004, until September 30,
2008.  PWC confirmed its presence in Virginia in a November 16,
2004 proposal for one of the prime vendor contracts, in which it
advised DSCP that "[o]ur PWC office in Virginia was opened last
year to serve as our [Continental United States-]based logistics
and coordination office.  They have greatly assisted us in the
coordination of shipments and the timely resolution of crisis
situations."

       (b)  <u>TSC</u>:  TSC has been identified as a key member of
the "PWC Group" engaged in the performance of the prime vendor
contracts at issue.  PWC's proposal for the first prime vendor
contract at issue in this action identified TSC's Chairman and
Managing Director, Ayman Sultan Al-Essa, as a member of PWC's
Contract Implementation Team.  Subsequently, over succeeding
years, TSC was repeatedly identified as a key member of the "PWC
Group" in PWC's proposals for prime vendor contracts and,
further, has been a key participant in the performance of the
prime vendor contracts.  TSC has submitted numerous invoices to
PWC for payment in connection with PWC's prime vendor contracts,
and, PWC subsequently has submitted invoices to DFAS for payment
of claims that included the amounts reflected on invoices
submitted by TSC to PWC.  Moreover, in December 2003, senior
management for TSC and PWC entered into a Strategic Operating

Agreement ("SOA") that recited that "PWC ha[d] entered into a [prime vendor] contract with the Government of the United States of America for the provision of, among other things, market-ready items . . . to be supplied to [U.S.] bases and installations in Kuwait, Qatar and Iraq", and appointed TSC as PWC's "Preferred Supplier in connection with PWC's performance of the Prime Vendor Contract."  The SOA remained in effect at least until July 2006.

### III.  VENUE

11.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(d) and 31 U.S.C. § 3732(a).  At least one of the defendants does business or has done business in this district.  Defendants are aliens, and as such, may be sued in any district pursuant to 28 U.S.C. § 1391(d).

### IV.  THE PARTIES

#### Plaintiff/Relator

12.  The Plaintiff is the United States of America.  The United States brings this lawsuit on behalf of the Department of Defense, the Defense Logistics Agency, the Defense Supply Center Philadelphia, and any other Federal agencies which purchased or provided funds for the purchase of products and other services from the Defendants.

13.  The Department of Defense ("DoD") is a Department of the United States.

14.  The Defense Logistics Agency ("DLA") is DoD's largest

-7-

combat support agency, providing worldwide logistics support to military services.

15.   The Defense Supply Center Philadelphia ("DSCP") is a field activity of DLA.   DSCP provides the members of the U.S. military and other personnel with food, clothing, textiles, medicines, medical equipment and construction supplies and equipment.   DSCP is responsible for managing DoD's prime vendor contracts for the purchase and supply of those commodities, including the prime vendor contracts for subsistence items at issue in this matter.   In July 2010, DSCP was renamed DLA Troop Support.   For purposes of this Complaint, the United States refers to the agency by its former name, DSCP, which was the name of the agency during most of the relevant events at issue.

16.   The Relator is Kamal Mustafa Al-Sultan ("Relator"), a resident of Kuwait.   Relator brought this action on behalf of the United States and for himself, pursuant to 31 U.S.C. § 3730(b), by filing a *Qui Tam* Complaint in this Court under seal on November 18, 2005.   Subsequently, Relator filed under seal a First Amended Complaint on September 25, 2006, and a Second Amended Complaint on October 1, 2009.   On November 13, 2009, the United States intervened in part and declined to intervene in part in this action, pursuant to 31 U.S.C. § 3730(b)(2) and (4).

17.   The United States timely asserts the causes of action alleged herein based on the filing of Relator's Complaint in this

matter, which was filed under seal on or about November 18, 2005, insofar as the causes of action herein arise out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the Relator's Complaint.

## The Defendants

18.  The Public Warehousing Company, K.S.C. ("PWC") is a corporation existing under the laws of Kuwait, with its headquarters in Sulaibiya, Kuwait City, Kuwait.  PWC currently operates under the brand name "Agility."  PWC is publicly listed under the symbol "AGLTY" on the Kuwait Stock Exchange and Dubai Financial Market.  The company's public website currently asserts that it "is one of the world's leading providers of integrated logistics with more than 25,000 employees in over 550 offices and 100 countries."  As described above with regard to this Court's personal jurisdiction over PWC, its operations include transactions with and within the United States.  At all relevant times, Tarek Abdul Aziz Sultan Al-Essa ("Tarek Sultan") has been the Chairman and Managing Director of PWC.

19.  The Sultan Center Food Products Company, K.S.C. ("TSC") is a corporation existing under the laws of Kuwait.  TSC is publicly listed under the symbol "SULTAN" on the Kuwait Stock Exchange.

20.  PWC and TSC have had common ownership and voting interests and shared business interests.  For example, TSC has a

-9-

substantial ownership and voting interest in PWC, insofar as TSC owns 100 percent of an entity known as United Capital Group, which, in turn, owns 30 percent of an entity known as the National Real Estate Company ("NREC"). As of June 27, 2010, NREC was one of only eight PWC shareholders, out of more than 15,000 PWC shareholders, with a voting interest in PWC. NREC, in turn, owns an estimated 22 percent of PWC. PWC and TSC have common and/or related management, as well. For example, an individual named Jamil Sultan Al Essa owns greater than eight percent of TSC and is on the Board of Directors of both NREC and PWC. Further, Jamil Sultan Al Essa is the uncle of PWC's Chairman and Managing Director, Tarek Sultan. Finally, as described earlier with regard to this Court's personal jurisdiction over PWC and TSC, these two entities partnered to supply subsistence items to U.S. military personnel in the Middle East, pursuant to the prime vendor contracts at issue in this case.

## V.   STATUTORY AND CONTRACTUAL BACKGROUND

### A.   The False Claims Act

21.   For violations occurring prior to May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1) (1986), provides in pertinent part that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or

fraudulent claim for payment or approval."

22.   For violations occurring on or after May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.  The FCA, as amended by FERA, defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2)(A) (2009).

23.   The false statements provision of the FCA, prior to the FERA amendments, provides that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false

record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (1986). As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

24. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

**B.    The Prime Vendor Contracts**

25. As part of its mission of supporting troops worldwide, DSCP issued solicitations for prime vendor contracts for the acquisition and supply of subsistence items for the U.S. military located for various parts of the Middle East.

26. DSCP awarded PWC three prime vendor contracts between May 2003 and July 2005 for the acquisition and provision of subsistence items for the U.S. military and other personnel located in the Middle East. DSCP awarded the first and last of

the three contracts to PWC as a result of a competitive process. The second prime vendor contract was a short-term extension of the first prime vendor contract.  DSCP awarded the second prime vendor contract to PWC on a sole-source basis as a "bridge contract" to avoid an interruption of services while the new prime vendor contract was being competed.  PWC's performance of the second and third prime vendor contracts partially overlaps.

### 1.   **Prime Vendor Contract No. 1 ("PV-I")**

27.   On May 10, 2002, DSCP issued Solicitation No. SP0300-02-R-4003 for a prime vendor to provide subsistence items to the U.S. military in two European Zones and one Middle East Zone. The Middle East Zone was referred to as "Zone III" and initially included Kuwait and Qatar.  This solicitation was for the first prime vendor contract at issue in this action, known as the "PV-I" contract, and was for a one-year base term, with up to four one-year options.

28.   PWC submitted a proposal for the PV-I contract, and DSCP awarded the contract to PWC.  On May 30, 2003, the parties entered into Contract No. SP0300-03-D-3061 ("PV-I"), with an effective date of May 28, 2003.  The PV-I contract incorporated by reference Solicitation No. SP0300-02-R-4003.  Pursuant to the PV-I contract, PWC was required to acquire and distribute subsistence items to U.S. military personnel located in Zone III (Kuwait and Qatar).

29.  On June 27, 2003, DSCP issued Modification P00001 to the PV-I contract.  This modification added Iraq to the group of countries for which PWC was to provide subsistence items to the U.S. military and other personnel.  The modification provided that the total acquisition value of the PV-I contract could increase by as much as 1,200 percent over the estimated contract value.

30.  DSCP paid PWC in excess of $1.4 billion under the PV-1 contract.

### 2.  Prime Vendor Contract No. 2 ("PV-II") and the PV-I/PV-II Bridge Contract ("PV Bridge Contract")

31.  On September 3, 2004, DSCP issued Solicitation No. SPM300-04-R-0323 for a prime vendor contract to provide subsistence items for the U.S. military and other DLA-authorized customers in several Middle East Zones, including Zone I, which was comprised of Iraq, Kuwait and Jordan.

32.  PWC provided its initial proposal for the PV-II contract to DSCP on November 16, 2004.  PWC's proposal was supplemented following further negotiations with DSCP.

33.  On February 16, 2005, DSCP awarded a "PV Bridge Contract" to PWC on a sole-source basis, Contract No. SPM300-05-D-3119 (Modification P00036 to PV-I), to permit PWC to continue providing services under the PV-I contract until the competition for the follow-on prime vendor contract could be completed.

34.  On July 7, 2005, DSCP awarded Contract No. SPM300-05-D-

3128 ("PV-II") to PWC, with an effective date of June 3, 2005, to provide subsistence items to the U.S. military and other DLA authorized customers in Zone I.  Even following the award and effective date of the PV-II Contract, PWC continued to provide prime vendor services under the terms and conditions of the PV-I Contract through December 15, 2005.  As of the filing of this Complaint, administration of PWC's PV-II Contract is ongoing.

35.  DSCP paid PWC approximately $1.1 billion under the PV Bridge Contract.

36.  DSCP has paid PWC over $7.3 billion dollars through October 2010 on the PV-II Contract.

### 3.  Prime Vendor Contract Terms

#### a.  Contractual Definition of PWC's Unit Prices

37.  The three prime vendor contracts at issue in this action (PV-I, PV Bridge, and PV-II, collectively referred to as the "prime vendor contracts") all contained the same contractual language as to how PWC was to invoice DSCP.  Under the prime vendor contracts, PWC was to invoice DSCP the "Unit Price" for each product delivered.  The prime vendor contracts defined the "Unit Price" as "the total price (in U.S. currency) that is charged to DSCP per unit for a product delivered to the Government."

38.  The three prime vendor contracts at issue provided that the Unit Price was comprised of two components: the "Delivered

-15-

Price" plus the "Distribution Price."  For purchases within the
Continental United States ("CONUS"), the prime vendor contracts
defined Delivered Price as "the manufacturer/supplier's actual
invoice price (in U.S. currency) to deliver the product to the
prime vendor's CONUS distribution point."  For purchases Outside
the Continental United States ("OCONUS"), the prime vendor
contracts defined Delivered Price as "the manufacturer/supplier's
actual invoice price (in U.S. currency) to deliver product to the
Prime Vendor's OCONUS distribution point."

39.  The prime vendor contracts defined the "Distribution
Price" as "a firm-fixed price, offered as a dollar amount, which
represents all elements of the unit price, <u>other than</u> the
delivered price." (Emphasis in original.)

40.  The prime vendor contracts further provided that the
Distribution Price "typically consist[ed] of [the prime vendor's
or PWC's] projected general and administrative expenses,
overhead, profit, packaging costs, transportation cost from [the
prime vendor's or PWC's] OCONUS distribution facility(s) to the
final delivery point or any other projected expenses associated
with the distribution function."

41.  The pricing structure for the prime vendor contracts
can be summarized this way:

> PWC's Unit Price = Manufacturer/Supplier's Delivered
> Price + PWC's Fixed Distribution Fee.

-16-

42.  Thus, the only variable cost component of the Unit
Price was the Delivered Price, which was to be determined from
the actual amount paid to a manufacturer/supplier to deliver
product to the Government's distribution point.  As is explained
in further detail below, TSC was not a manufacturer/supplier for
most LMRI, and the contracts therefore did not permit PWC to use
TSC's prices as the Delivered Price for LMRI for which it was not
a manufacturer/supplier.

### b.    PWC's Contractual Obligation to Return Rebates and Discounts to DSCP

43.  The prime vendor contracts required PWC to return to
DSCP all rebates and discounts attributable to the prime vendor
contracts.  For example, the PV-I contract contained the
following clause for rebates and discounts:

> REBATES/DISCOUNTS . . .
>
> B. Rebates and discounts are to be returned
> to DSCP when they are directly attributable
> to sales resulting from orders exclusively
> submitted by DSCP or its customers.
> Additionally, any rebates and discounts
> offered to any commercial customer or other
> Government organization shall be returned to
> DSCP or its customer in the form of an up-
> front price reduction (resulting in a lower
> delivered invoice price to the

-17-

customer/reduced STORES price).

. . .

As referenced in this provision, "STORES" is an acronym for the "Subsistence Total Order and Receipt Electronic System." STORES is a government computer system used by DoD customers to place orders under the prime vendor contracts.

44. The PV-II contract similarly required PWC to return to DSCP all rebates and discounts attributable to that contract:

> REBATES/DISCOUNTS
>
> Rebates and discounts are to be returned to DSCP when they are directly attributable to sales resulting from orders exclusively submitted by DSCP or its customers. Additionally, any rebates and discounts offered to any commercial customer or other Government organization shall be given to DSCP or its customers in the form of an up-front price reduction. The discount/allowance shall be reflected via a reduced STORES price, resulting in a lower invoice price to the customer.

45. In addition to the contractual requirement that PWC return to DSCP all rebates and discounts directly attributable to sales on the prime vendor contracts, the prime vendor contracts

-18-

required that PWC submit Monthly Rebate Reports to DSCP detailing all rebates and discounts directly attributable to sales.

46.   Although the prime vendor contracts provided that PWC was required to return to DSCP all rebates and discounts attributable to the prime vendor contracts, PWC falsely characterized certain rebates and discounts as "prompt payment" discounts, which PWC claimed it was allowed to retain under the prime vendor contracts.  Further, PWC encouraged certain vendors to mischaracterize volume-based discounts as "prompt pay" discounts, and urged vendors to remove from their invoices to PWC any reference to the discount.  As is described in further detail below, the mischaracterized rebates and discounts were not prompt payment discounts and, therefore, should have been returned to DSCP.

47.   PWC's retention of purported prompt payment discounts ultimately became the subject of a dispute between the parties during contract performance.  By its letter dated March 16, 2007, PWC submitted a claim, pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, seeking the Contracting Officer's interpretation of PWC's contractual requirement to return to DSCP prompt payment discounts.  The Contracting Officer issued her final decision dated July 18, 2007, specifying various criteria that needed to be satisfied for PWC to retain prompt payment discounts, and PWC appealed her decision to the Armed Services

Board of Contract Appeals ("ASBCA").  During the pendency of the ASBCA appeal, the Contracting Officer issued a supplemental final decision, which provided, among other things, that PWC was contractually permitted to retain genuine and legitimate *bona fide* prompt payment discounts and reaffirmed the criteria specified in her July 18, 2007 final decision.  On September 25, 2009, the ASBCA concluded that the declaratory relief sought by PWC would not resolve the parties' dispute and dismissed PWC's appeal without prejudice.

## VI.    SCHEME 1: INFLATED PRICES FOR LMRI

### A.    TSC Was a Consolidator/Distributor of LMRI and Not a Supplier/Manufacturer

48.    The prime vendor contracts required PWC to purchase perishable and "market ready" products on the local market (*i.e.*, Local Market Ready Items or LMRI).  LMRI products included fresh fruits and vegetables, dairy products, eggs and "market ready" products such as fresh bakery items, bottled water, and soda.

49.  In July 2003, shortly after PWC was awarded the PV-I contract, PWC informed LMRI manufacturers/suppliers that TSC would be its "sole authorized procurement entity for all prime vendor related products until further notice."  Thereafter, when PWC received an order for LMRI from DSCP, it usually forwarded the order to TSC.

50.  TSC, in turn, called upon various local manufacturers/ suppliers to provide the required LMRI products.  Local

manufacturers/suppliers made or acquired the LMRI, and then sorted, inspected and packaged their products in accordance with U.S. military requirements for delivery to U.S. troops.  PWC trucks picked up the LMRI from the facilities of local manufacturers/suppliers and either moved the product to PWC's warehouse or transported it directly to U.S. troops in Kuwait and Iraq.  From time to time, local manufacturers/suppliers delivered the LMRI to PWC's warehouse or directly to the U.S. military customer.

51.  During the performance of the prime vendor contracts, TSC acted as a consolidator/distributor for the OCONUS subsistence items.  With the exception of certain bakery items, TSC neither manufactured or supplied LMRI to the Government's distribution point.

52.  Any services provided by TSC to PWC for the prime vendor contracts were in the form of consolidation and distribution services and were compensable to PWC only through the fixed contract Distribution Price and not the Delivered Price.  The prime vendor contracts did not allow PWC to pass along as part of the Delivered Price any costs it might have incurred for TSC's consolidation and distribution activities.

53.  In its proposal for the PV-II Contract, PWC

specifically confirmed that since July 2003, TSC's role on the
prime vendor contracts had been as a consolidator/distributor.
PWC's PV-II proposal states:

- "Using its purchasing power, TSC has
  succeeded to gain the commitment of the local
  suppliers and manufacturers in supporting
  TSC's efforts in providing a high service
  level to PWC."

- "In order to assure a high fill rate, TSC has
  assigned the biggest suppliers and
  manufacturers in the region.  There are more
  than three suppliers for each category."

- "Since July 2003, TSC has been receiving the
  LMRI orders, coordinating with sub
  contractors, consolidating all Iraq orders,
  delivering Kuwait orders to the DFAC's,
  following up to make sure everything is done
  perfectly."

54.  In certain of its internal communications, PWC
described TSC's role as that of a consolidator or distributor.
For example, in an e-mail dated January 12, 2006, discussing how
PWC could respond to DSCP's request that the company produce
copies of the manufacturer/supplier invoices for LMRI that it
used to determine the Delivered Prices it charged the government,

Stephen Lubrano, PWC Assistant General Manager, Commercial, wrote
that PWC could not produce invoices from local manufacturer[s]
because it dealt exclusively through TSC, which he identified as
"a consolidator."  Mr. Lubrano's e-mail stated:

> As part of the Price Audit [the government]
> has requested manufacturer's invoices.  This
> will be difficult on subject products as we
> deal not with a local manufacturer but rather
> through a consolidator . . . . I am of the
> mind that we submit TSC invoices then wait
> for a request for further documentation.

55.  In another internal email, PWC's Rani Wehbe, Senior
Supply Chain Manager, stated, "[f]or example, The Sultan Center
(TSC) in Kuwait acts as the consolidator and liaison for all
local products that are sourced locally (e.g. Pepsi, Coca Cola,
bread, eggs, ice cream, yoghurt. . . etc.)."

56.  Not only did PWC represent and identify TSC as a
consolidator or distributor, but TSC's actual duties with regard
to the provision of LMRI were consistent with those of a
consolidator/distributor and not a manufacturer/supplier (except
with regard to some bakery products).

**B.   PWC Falsely Claimed TSC's LMRI Prices as the "Delivered
Price" on Invoices to DSCP**

57.  When invoicing PWC for products supplied under the
prime vendor contracts, TSC routinely and substantially marked up

the LMRI invoices charged by its local manufacturers/suppliers for the prime vendor contracts.

58.  PWC knew that the price TSC invoiced PWC for LMRI was inflated.  PWC knew what amounts local manufacturers/suppliers invoiced TSC for LMRI and knew that TSC was charging PWC substantially more for LMRI.

59.  PWC also knew that TSC was charging PWC more than it was charging other TSC customers for the same LMRI.  PWC performed regular market surveys of TSC's retail prices.  Many of these market surveys indicated that TSC was charging more than the retail price on a number of items.

60.  PWC knew that TSC was not a manufacturer/supplier for LMRI with the exception of some bakery products.  PWC further knew that under the prime vendor contracts, fees charged by a consolidator or distributor could not be passed on to DSCP through the Delivered Price.  The prime vendor contracts provided that the fixed Distribution Fee that PWC negotiated with DSCP was to compensate PWC for all costs and profit other than the Delivered Price.

61.  Yet PWC presented invoices to DSCP for LMRI falsely claiming TSC's inflated prices as the Delivered Price, rather than the actual prices charged by the manufacturers/suppliers of LMRI, plus the separate Distribution Fee for the LMRI.

62.  Attached as Exhibit 1 to this Complaint is a

spreadsheet showing the specific categories of LMRI that PWC purchased through TSC during 2003 through 2008, and for which it used TSC's price, rather than the actual manufacturer/supplier's price, as the Delivered Price on its invoices to DSCP, and resulting in overcharges to DSCP; the quantities DSCP purchased for each specific LMRI category; and PWC's total sales to DSCP for each LMRI category.

63.  By using TSC's inflated invoices for the LMRI as the Delivered Price in its invoices to DSCP, PWC overcharged the United States for LMRI and knowingly submitted false claims to the United States.  The United States paid these inflated prices.

**C.   PWC Received a 10 Percent Discount or Rebate From TSC and Others on All LMRI Purchases and Failed to Return the Discount or Rebate to DSCP**

64.  PWC and TSC agreed that PWC would pay and did pay TSC approximately 10 percent less than TSC's invoiced prices for LMRI.

65.  PWC never disclosed to DSCP that it was receiving a 10 percent discount or rebate for LMRI purchased through TSC, nor, contrary to its contractual obligations, did PWC ever pass on to DSCP the 10 percent discount or rebate it obtained from TSC for the LMRI.

66.  The monthly 10 percent discount/rebate that PWC obtained from TSC for the period from July 4, 2003 to November 30, 2006, is itemized in the spreadsheet provided by PWC to the

United States during the investigation of the *qui tam* allegations at Bates Nos. PWC-0500268 to PWC-0500351.

67.  At the outset of the PV-I contract, PWC and TSC attempted to disguise the 10 percent discount/rebate as compensation for fictitious services rendered by PWC to TSC under a purported and short-lived Services Agreement entered into by senior management for both companies on December 14, 2003.

68.  The Services Agreement purported to require PWC to perform a variety of warehousing and distribution functions and services for TSC in connection with PWC's prime vendor contracts with DSCP: (1) receiving products, (2) order preparation and delivery, (3) maintaining correct inventory balances, (4) performing value added services, and (5) performing distribution services.

69.  In exchange for PWC's purportedly providing warehousing and distribution services to TSC, TSC agreed to "pay to [PWC] a monthly fee (the 'Logistics Distribution Fee')", which fee "shall equal ten percent (10%) of the total invoices (the 'PVC Invoices') presented by [TSC] to PWC for payment for the products supplied by [TSC] to the [United States customer] or PWC (as the case may be) pursuant to the [prime vendor contract] for such month."

70.  The obligations that PWC purportedly undertook to provide to TSC under the Services Agreement were the same

-26-

obligations that PWC already had agreed to perform for the United States under the prime vendor contracts and for which PWC was separately compensated by the United States through the Distribution Fee under the prime vendor contracts.  TSC itself had no obligation to perform the services that it ostensibly contracted to PWC through the Services Agreement.  Thus, there was no legitimate purpose for TSC agreeing to compensate PWC for the provision of these services.

71.  Just one day after the Services Agreement was executed, a letter from Aymen B. Al-Sultan, TSC's Managing Director and Chief Operating Officer, purported to reflect a further agreement between TSC and PWC that the Services Agreement "has not been authorized and/or duly executed by either TSC or PWC, and, that, as such, the Agreement is null and void and of no force or effect."  The letter further directed PWC to "destroy any copies of the Agreement in your possession."

72.  Notwithstanding this action, throughout the performance of the prime vendor contracts, TSC has paid PWC a monthly fee equal to approximately 10 percent of TSC's total invoices to PWC under the prime vendor contracts.  During performance of the prime vendor contracts, PWC's management referred to and described the 10 percent discount/rebate by various names, including but not limited to terms such as "logistics fee," "10% of sales," "10% rebate" and "our Logistics fee percentage."  PWC

provided no service or product to TSC for these payments.

73. During the United States' investigation of allegations of false billings by PWC, PWC represented to the United States that the 10 percent discount/rebate that it received from TSC was a prompt payment discount that it was entitled to keep under the terms of the prime vendor contracts. Notwithstanding this claim, the 10 percent discount/rebate that TSC provided to PWC on its invoices was not associated with early payments by PWC to TSC.

74. PWC's payment practices confirm that TSC's 10 percent payments were not "prompt" payments which, by definition, necessarily would be paid more promptly than contractually required. Under the terms of the SOA, PWC was required to pay TSC within either 20 or 30 days of receipt of TSC's invoice, without receiving any prompt payment discount. SOA, Article 3, Section 3.01(c) ("PWC shall pay to TSC all amounts shown on each Statement of Account within thirty (20) [sic] days after PWC Purchasing Department's receipt of the Statement of Account."). PWC's payment records confirm that PWC typically did not pay TSC until 60-90 days after receipt of TSC's invoice, *i.e.*, approximately one to two months after it was contractually required to pay, yet PWC still received a 10 percent discount from TSC.

75. Accordingly, the so-called 10 percent discount/rebate was not a prompt payment discount. PWC did not disclose the

10 percent discount/rebate or its true nature to the United States or comply with the contractual requirements that it return the money to the United States.

76.   PWC's agreement with TSC was not the only arrangement whereby it received an undisclosed 10 percent discount or rebate. PWC had a similar arrangement with another entity, known as Jordan Global, whereby it paid 10 percent less than was invoiced for LMRI by Jordan Global.  PWC submitted the full amount of Jordan Global's invoices to DSCP, despite paying Jordan Global 10 percent less than Jordan Global's invoiced price.  PWC did not disclose this discount/rebate to the United States or comply with the contract requirement that it return this money to the United States.

77.   PWC knowingly overcharged the United States for the LMRI and submitted false claims to the United States by its practice of invoicing the United States for 10 percent more than PWC actually paid for LMRI purchased for the prime vendor contracts through TSC and Jordan Global, as described more fully in the preceding paragraphs.  TSC caused PWC to submit false claims to the United States by its practice of inflating its invoices for 10 percent more than PWC actually paid TSC for LMRI. The United States paid PWC's excessive claims.

### D.    PWC Charged DSCP Inflated Prices for Local Market Ready Items Purchased Directly From Local Manufacturers/ Suppliers

78.    PWC also inflated the prices of LMRI that PWC purchased directly from manufacturers/suppliers other than TSC. The following provides examples of such overcharges to DSCP with regard to a DSCP Purchase Order received by PWC on or about December 27, 2004, and LMRI delivered on or about January 9, 2005.  A comparison of PWC's Sales Invoice 015665 for DSCP Purchase Order W91C0243625632, with the invoice from its supplier IMISK dated January 3, 2005, shows that PWC overcharged DSCP for the following LMRI purchased from IMISK:

- •    Avocados: $3.04 per pound

- •    Honeydew Melons:  $0.85 per pound

- •    Lettuce:  $1.20 per pound

- •    Onions (Green): $1.47 per pound

- •    Parsley:  $4.48 per pound

- •    Radishes: $4.12 per pound

79.    PWC knew it was inflating the local manufacturers/ suppliers' invoiced prices and was overcharging DSCP for these products.  As a result, PWC knowingly submitted false claims to the United States for these LMRI purchased directly from local manufacturers/suppliers, other than TSC.  The United States paid these inflated prices.

## VII.  SCHEME 2:  PWC FAILED TO RETURN
## OTHER REBATES AND DISCOUNTS OWED TO DSCP

80.  PWC engaged in various schemes with its CONUS manufacturers/suppliers to falsely portray rebates, allowances and discounts as prompt payment discounts in order to avoid returning these discounts to DSCP.

81.  The discounts that PWC received from certain of its CONUS manufacturers/suppliers, which PWC characterized as prompt payment discounts, were not based upon PWC's early payment.  In some cases, PWC's CONUS manufacturers/suppliers agreed to increase the so-called prompt payment discounts to PWC without requiring payment earlier than the standard contractual requirement.  Instead, the discounts were directly attributable to sales to PWC and, therefore, were contractually required to be returned to DSCP in the form of up-front price reductions, resulting in lower Delivered Prices to DSCP.

82.  PWC knowingly failed to comply with its contractual requirements and submitted false claims to the United States, which included or relied upon false characterizations of rebates and discounts, and which were subsequently paid by the United States.  The following paragraphs provide examples of such false claims.

-31-

A.   **Examples of PWC's Failure to Return Rebates and Discounts Owed to the United States**

**Sara Lee Corporation**

83.   In January 2005, PWC requested that Sara Lee Corporation ("Sara Lee"), a CONUS supplier to PWC on the prime vendor contracts, grant it a five percent "early payment discount" for payments made within 60 days.  Sara Lee countered by offering a two percent discount with payment within 20 days. As negotiations continued, PWC told Sara Lee that for an increase in the discount amount, it would switch new business to Sara Lee. Sara Lee received additional business from PWC and eventually agreed to increase its two percent discount to five percent on all items with payment within 30 days.

84.   In discussions with Sara Lee, PWC insisted the agreed discount be called an "early payment discount."  Sara Lee representatives did not want to characterize the discount as an early payment discount, and suggested instead that it be called a marketing allowance or rebate.  In an e-mail to PWC dated October 24, 2006, a Sara Lee representative advised, "My Finance guys do not want to call it early payment discount.  Do you have any other ideas of what you want us to name it or does it matter if we call it a marketing program?"  Sara Lee ultimately agreed to characterize the discount as an "early payment discount," as requested by PWC, notwithstanding the fact that both PWC and Sara Lee representatives knew that the discount was given in exchange

-32-

for PWC's transferring new business to Sara Lee.

85.   PWC knew it was contractually required to return the foregoing discounts from Sara Lee to the United States or reduce the prices it charged as the Delivered Price for Sara Lee items. By failing to return the foregoing allowances to DSCP or adjust the Delivered Price to reflected the foregoing allowances, PWC submitted false claims for payment of Sara Lee products to the United States.   The United States paid PWC's false claims.

### Texas Best Trading LLC

86.   PWC's dealings with CONUS supplier Texas Best Trading LLC ("Texas Best") provide another example of how PWC falsely characterized a sales-related discount as a prompt payment discount.   In January 2005, Texas Best was supplying chicken products to PWC for the prime vendor contracts and offering PWC prompt payment discounts of five percent for payment within 60 days.

87.   In February 2005, PWC and Texas Best representatives engaged in discussions regarding incentives for increasing Texas Best sales to PWC.   Texas Best agreed to increase its purported prompt payment discounts to PWC in exchange for increased purchases by PWC.   Under the new agreement, Texas Best increased the existing discount from five to seven percent for payment within 60 days of the receipt of goods, with the net balance being due, without any discount, within 75 days of receipt of

goods.  Texas Best also agreed to provide even larger discounts for payment within 30 days (8.5 percent) and payment within 45 days (7.5 percent).

88.  PWC knew the so-called prompt payment discounts were offered, at least in part, to preserve Texas Best's business with PWC and to increase that business.  For example, the discount scheme increased PWC's discount when payment was made within 60 days of receipt of goods from 5 percent to 7 percent, solely as an incentive for PWC to increase purchases from Texas Best.  Accordingly, the so-called prompt payment discounts were not *bona fide* prompt payment discounts.

89.  PWC knew it was contractually required to return the foregoing allowances from Texas Best to the United States or reduce the prices it charged as the Delivered Price for Texas Best items.  PWC did neither.  By failing to return the foregoing discounts to DSCP or adjust the Delivered Price to reflected the foregoing discounts, PWC submitted false claims for payment of the Texas Best products to the United States.  The United States paid PWC's false claims.

-34-

**Barber Foods**

90.   PWC also negotiated a market allowance with its CONUS supplier Barber Foods, yet falsely characterized it as a prompt payment discount.  In an internal PWC e-mail dated January 15, 2005, regarding Barber Foods, a PWC employee wrote:

> Please note that PWC is being given a
> $1.50/case "prompt pay - cash in advance"
> discount.  This does not show on the invoice
> - we should pay short by this amount.  Barber
> asks that this be kept "highly confidential"
> as this is normally given distributors in the
> states as "market allowance".  They are
> making it a prompt pay for PWC's
> convenience.. . .

91.   PWC knew that the discount it negotiated with Barber Foods was directly attributable to sales and therefore under the prime vendor contracts, should have been returned to DSCP or used to reduce the Delivered Price charged for Barber Foods products. PWC did neither.  By failing to return the foregoing market allowances to DSCP or adjust the Delivered Price to reflect the foregoing market allowances, PWC submitted false claims for payment of the Barber Foods products to the United States.  The United States paid PWC's false claims.

-35-

### Zartic, Inc.

92.   In the Spring of 2006, PWC obtained sales-based discounts for purchases of pre-cooked hamburgers and other products from Zartic, Inc. ("Zartic"), located in Rome, Georgia.

93.   Zartic initially offered PWC a four percent discount for payment within 21 days, with the net balance being due in 22 days.  To increase its sales to PWC, Zartic increased its discount to PWC from four percent to seven percent for purchases from May 29, 2006, through July 15, 2006.  As was the case before, the seven percent discount was allowed for payments made within 21 days, with the net balance being due in 22 days.  Thus, the increased discount was attributable to PWC's agreement to purchase products from Zartic and not based upon the promptness of the payment.

94.   PWC knew it was contractually required to return the foregoing discount from Zartic to the United States or reduce the prices it charged as the Delivered Price for Zartic items. PWC did neither.  By failing to return the foregoing discounts to DSCP or adjust the Delivered Price to reflected the foregoing discounts, PWC submitted false claims for payment of the Zartic products to the United States.  The United States paid PWC's false claims.

-36-

**B.  PWC's Directive to Manufacturers/Suppliers to Conceal Facts**

95.  To further conceal the true nature of its rebate and discount program, on May 29, 2006, a PWC official sent the following e-mail to its manufacturers/suppliers (with copies to various PWC officials):

> **Subject:** TERMS ON THE INVOICES
>
> Dear Valued Supplier -
>
> It has been decided by PWC management to request that you **no longer** reflect prompt pay discounts on invoices.
>
> **Please only print the net terms**.
>
> However all the currently existing terms established between PWC and your organization will remain intact.
>
> Hence you are requested to **stop printing** the terms on invoices effective **01/JUNE/06**
>
> Your cooperation in this matter is appreciated.
>
> . . .

(Emphasis in original.)  PWC, in turn, invoiced DSCP using the inaccurate prices on these invoices as the Delivered Price and did so knowing that the prices did not represent the supplier's actual prices to PWC and were, therefore, false and fraudulent claims.

-37-

96.   PWC negotiated favorable payment terms with its CONUS manufacturers/suppliers and induced these manufacturers/suppliers to mischaracterize the terms as early payment or prompt payment discounts in order to avoid returning the discounts and rebates owed to DSCP under the prime vendor contracts.   PWC failed to return these discounts or rebates to DSCP, or reduced the Delivered Price for the covered products, as required by the prime vendor contracts.

**COUNT 1**

**VIOLATIONS OF THE FALSE CLAIMS ACT,**

**31 U.S.C. § 3729(a)(1) (1986)**

**AGAINST PWC AND TSC**

**(False Claims Based for Inflated LMRI Prices)**

97.   The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

98.   Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, TSC knowingly caused PWC to submit, and PWC knowingly submitted, falsely inflated invoices for LMRI under the

PV-I Contract, the Bridge Contract and the PV-II Contract.   In so doing, defendants TSC and PWC acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

99.  By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

### COUNT 2

### VIOLATIONS OF THE FALSE CLAIMS ACT,

### 31 U.S.C. § 3729(a)(1)(A) (2009)

### AGAINST PWC AND TSC

### (False Claims for Inflated LMRI Prices)

100. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

101. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) (2009).  Specifically, TSC knowingly caused PWC to submit, and PWC knowingly submitted, falsely inflated invoices for LMRI under the PV-II Contract.  In so doing, defendants TSC and PWC acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

102. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at

trial.

**COUNT 3**

**VIOLATIONS OF THE FALSE CLAIMS ACT,**

**31 U.S.C. § 3729(a)(2) (1986)**

**AGAINST PWC AND TSC**

**(False Statements Regarding LMRI Prices)**

103. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

104. Defendants knowingly made, used, or caused to be made or used false records to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2).  Specifically, TSC knowingly caused to be more or used, and PWC did make or use false records or statements to get false or fraudulent claims paid or approved by the Government by falsely representing TSC's inflated LMRI prices as the Delivered Prices for LMRI under the PV-I Contract, the Bridge Contract and the PV-II Contract.  In so doing, defendants TSC and PWC acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

105. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT 4**

**VIOLATIONS OF THE FALSE CLAIMS ACT,**

**31 U.S.C. § 3729(a)(1)(B) (2009)**

**AGAINST PWC AND TSC**

**(False Statements Regarding LMRI Prices)**

106. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

107. Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B) (2009). Specifically, TSC knowingly caused to be more or used, and PWC did make or use false records or statements material to false or fraudulent claims in falsely representing TSC's inflated LMRI prices as the Delivered Prices for LMRI under the PV-I Contract, the Bridge Contract and the PV-II Contract. In so doing, defendants acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

108. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT 5**

**VIOLATIONS OF THE FALSE CLAIMS ACT,**

**31 U.S.C. § 3729(a)(1) (1986)**

**AGAINST PWC AND TSC**

**(False Claims/Failure to Return Rebates**

**and Discounts Owed to the United States)**

109. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

110. Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1).  PWC negotiated and obtained from its CONUS manufacturers/suppliers various sales-based price discounts, allowances and rebates that it should have returned to the United States, but did not.  Further, PWC agreed with TSC and Jordan Global that PWC would pay 10 percent less than the amounts invoiced for LMRI, and did so without disclosing or returning to the United States these discounts, contrary to the requirements of the prime vendor contracts.  As a result, by failing to return or otherwise reflect the value of these discounts, allowances and rebates in its invoices to DSCP, PWC submitted false claims to DSCP under the PV-I Contract, the Bridge Contract and the PV-II Contract.  Further, TSC caused PWC to submit false or fraudulent claims to DSCP that failed to reflect its 10 percent discount.

-42-

In so doing, Defendants acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

111. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT 6**

**VIOLATIONS OF THE FALSE CLAIMS ACT,**

**31 U.S.C. § 3729(a)(1)(A) (2009)**

**AGAINST PWC AND TSC**

**(False Claims/Failure to Return Rebates**

**and Discounts Owed to the United States)**

112. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

113. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) (2009). Specifically, PWC negotiated and obtained from its CONUS manufacturers/suppliers various sales-based price discounts, allowances and rebates that it should have returned to the United States, but did not. Further, PWC agreed with TSC and Jordan Global that PWC would pay 10 percent less than the amounts invoiced for LMRI, and did so without disclosing or returning to the United States these discounts, contrary to the requirements

-43-

of the prime vendor contracts.  As a result, by failing to return or otherwise reflect the value of these discounts, allowances and rebates in its invoices to DSCP, PWC submitted false claims to DSCP under the PV-II Contract.  Further, TSC caused PWC to submit false or fraudulent claims to DSCP that failed to reflect its 10 percent discount.  In so doing, Defendants acted with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the claims.

114. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT 7

## COMMON LAW FRAUD

## AGAINST PWC AND TSC

115. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

116. Defendants falsely represented that the Delivered Prices charged for LMRI, which were paid for in whole by the United States through DSCP in accordance with the PV-I Contract, the Bridge Contract and the PV-II Contract, were true and accurate, when, in fact, such prices were inflated.

117. Defendants failed to inform the United States that the invoices were false and fraudulent when submitted to the United States in accordance with the PV-I Contract, the Bridge Contract

and the PV-II Contract insofar as such invoices failed to reflect discounts, rebates and other allowances that should have been returned to the United States, but were not.  Defendants had a duty to disclose due to their superior knowledge.

118. Defendants knew that their representations that the invoices were true and accurate were false.

119. These misrepresentations were material.

120. Defendants knew that the United States would rely, and intended the United States to rely, on these false representations.

121. The United States justifiably relied upon these false representations and material omissions.

122. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT 8**

**PAYMENT BY MISTAKE**

**AGAINST PWC**

123. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

124. The United States made payments to Defendant PWC under the PV-I Contract, the Bridge Contract and the PV-II Contract in the erroneous belief that this Defendant was entitled to payment, without knowing that Defendant's claims were made as part of a scheme to defraud the United States.

125. The United States' erroneous beliefs were material to the amount of the payments made by the United States.

126. Because of these mistakes of fact, the Defendant received funds to which it was not entitled.

127. By reason of the overpayments, the United States suffered damages in an amount to be determined at trial.

**COUNT 9**

**UNJUST ENRICHMENT**

**AGAINST PWC AND TSC**

128. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

129. The United States made payments to Defendant PWC, which in turn made payments to TSC, under the PV-I Contract, the Bridge Contract and the PV-II Contract, in the erroneous belief that this Defendant was entitled to payment without knowing that the Delivered Price Defendant charged to DSCP for LMRI exceeded the true Delivered Price, and that PWC had failed to return rebates, allowances and discounts as required under its prime vendor contracts.

-46-

130. The United States is entitled to the return of all payments by the United States to PWC for subsistence items due to the false claims presented according to the PV-I Contract, the Bridge Contract and the PV-II Contract from 2003 to the present time.

131. By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled.  Defendants have been unjustly enriched in an amount to be established at trial.

### COUNT 10

### BREACH OF CONTRACT

### AGAINST PWC

132. The United States re-alleges and incorporates herein by reference paragraphs 1 through 96.

133. PWC entered into contracts with the United States, including but not limited to the PV-I Contract, the Bridge Contract and the PV-II Contract.  These contracts imposed obligations on PWC, including but not limited to an obligation to invoice DSCP the Delivered Price, as that term is defined by the prime vendor contracts, for LMRI, and to return to the United States discounts, rebates and allowances directly attributable to sales under the prime vendor contracts.

134. PWC breached its contractual obligations to submit accurate and true invoices to DSCP for subsistence items in

-47-

accordance with the PV-I Contract, the Bridge Contract and the PV-II Contract.

135. As a result of PWC's breach of contract, the United States has been damaged by the false and fraudulent invoices in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as provided by law;

3.   The cost of this action, plus interest, as provided by law; and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as provided by law;

3.   The cost of this action, plus interest, as provided by law; and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as
     provided by law;

3.   The cost of this action, plus interest, as provided by law;
     and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 4:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as
     provided by law;

3.   The cost of this action, plus interest, as provided by law;
     and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 5:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as
     provided by law;

3.   The cost of this action, plus interest, as provided by law;
     and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 6:**

As against all Defendants, judgment in an amount equal to:

1.   Statutory damages in an amount to be established at trial;

2.   Civil penalties for each false claim or false statement as
     provided by law;

3.   The cost of this action, plus interest, as provided by law;
     and

4.   Any other relief that this Court deems appropriate.

**AS TO COUNT 7:**

As against all Defendants, judgment in an amount equal to:

1.   Compensatory damages in an amount to be established at
     trial;

2.   The cost of this action, plus interest, as provided by law;
     and

3.   Any other relief that this Court deems appropriate.

**AS TO COUNT 8:**

As against PWC, judgment in an amount equal to:

1.   The money paid by the United States to PWC, plus interest;

2.   The cost of this action, plus interest, as provided by law;
     and

3.   Any other relief that this Court deems appropriate.

**AS TO COUNT 9:**

As against all Defendants, judgment in an amount equal to:

1.   The money paid by the United States to, or received by,
     these Defendants, plus interest;

2.   The cost of this action, plus interest, as provided by law;

and

3.    Any other relief that this Court deems appropriate.

**AS TO COUNT 10:**

As against PWC, judgment in an amount equal to:

1.    All damages caused by PWC's breach of its contractual
      obligations in an amount to be established at trial;

2.    All reasonably foreseeable damages which flowed from PWC's
      breach of its contractual obligations in an amount to be
      established at trial;

3.    The cost of this action, plus interest, as provided by law;
      and

4.   Any other relief that this Court deems appropriate.


DATED:   January 5, 2011

                              Respectfully submitted,


                              SALLY QUILLIAN YATES
                              United States Attorney


                               /s/ AMY L. BERNE
                              AMY L. BERNE
                              Assistant United States Attorney
                              Georgia Bar No. 006670
                              75 Spring Street, S.W.
                              Atlanta, GA 30303
                              Telephone: (404) 581-6261
                              Facsimile: (404) 581-6163
                              Email: amy.berne@usdoj.gov

                              TONY WEST
                              Assistant Attorney General
                              JOYCE R. BRANDA
                              MICHAL TINGLE
                              ART J. COULTER
                              JOHN WARSHAWSKY
                              MARY CLARE GARTLAND CLAUD
                              U.S. Department of Justice
                              P.O. Box 261
                              Ben Franklin Station
                              Washington, D.C. 20044
                              Tel. 202-307-1088

                              Attorneys for the United States