**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* KAMAL MUSTAFA AL-SULTAN, | ) ) ) | |
| Plaintiff/Relator, | ) ) ) | |
| v. | ) ) | CIVIL CASE NO. 1:05-CV-02968-TWT |
| THE PUBLIC WAREHOUSING COMPANY, K.S.C., *et al.*, | ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF THE PUBLIC
WAREHOUSING COMPANY, K.S.C.'S MOTION TO
TRANSFER VENUE TO THE EASTERN DISTRICT OF
PENNSYLVANIA, PURSUANT TO 28 U.S.C. § 1404(a)</u>**

Pursuant to 28 U.S.C. § 1404(a), Defendant The Public Warehousing Company, K.S.C., a/k/a Agility ("PWC"), by and through its attorneys, respectfully submits this Memorandum of Law in support of its Motion to Transfer Venue to the Eastern District of Pennsylvania.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

I.     INTRODUCTION .................................................................1

II.    STATEMENT OF FACTS ....................................................2

    A.    None of the Parties Are Located in the Northern District of Georgia; Nominal Plaintiff the Philadelphia Supply Center Is Located in the Eastern District of Pennsylvania. ....................................2

        1.    Relator Kamal Mustafa Al-Sultan ................................2

        2.    Plaintiff the United States ............................................3

        3.    Nominal Plaintiffs DoD and DLA ................................3

        4.    Nominal Plaintiff the Philadelphia Supply Center .......4

        5.    Defendant PWC ...........................................................4

        6.    Defendant The Sultan Center ......................................5

    B.    PWC Contracted with the Philadelphia Supply Center to Supply Subsistence Items to U.S. Troops in the Middle East. ...........................5

    C.    During Performance of the PV Contracts, PWC Submitted All Invoices and Updates to the Philadelphia Supply Center, Which Managed All Aspects of Contract Administration. ................................6

    D.    The Vast Majority of Key Philadelphia Supply Center Witnesses Are Located in the Eastern District of Pennsylvania. .............8

    E.    The Relator Brought His *Qui Tam* Action in the Northern District of Georgia Despite This District's Tenuous Connection to the Events and People of this Case. ......................................9

    F.    Only One Supplier Mentioned in the FAC Had Any Ties to This District, and It No Longer Operates Here. ...................................10

III.   ARGUMENT ...................................................................12

    A.    Summary of Argument and Legal Standard...........................................12

    B.    Venue Is Proper in the Eastern District of Pennsylvania. .....................14

    C.    The Balance of Factors Strongly Favors a Transfer to the Eastern District of Pennsylvania. ...............15

i

1.    The Locus of Operative Facts in the United States Is Indisputably Philadelphia (Factor 4).............................................16

2.    The Convenience of the Parties and Witnesses Favors Transfer to the Eastern District of Pennsylvania, Where DSCP and the Vast Majority of Government Witnesses Are Located (Factors 1 and 3). ....................................................18

3.    Philadelphia Is the U.S. Location with the Most Significant Number of Relevant Documents in This Case (Factor 2)...............................................................................21

4.    Trial Efficiency and the Interests of Justice Weigh Strongly in Favor of Transfer to the Eastern District of Pennsylvania (Factor 9). ............................................................22

5.    The Remaining Transfer Factors Are Neutral and Do Not Favor Retaining the Case in the Northern District of Georgia.....................................................................................24

IV.    CONCLUSION................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A.J. Taft Coal Co. v. Barnhart*,
  291 F. Supp. 2d 1290 (N.D. Ala. 2003).............................................................14

*Abramowitz v. Tropicana Atl. City Corp.*,
  No. 14-CV-2064 (JS)(ARL),
  2015 WL 1014511 (E.D.N.Y. Mar. 6, 2015)......................................................17

*Bell v. K Mart Corp.*,
  848 F. Supp. 996 (N.D. Ga. 1994) ............................................................... 16, 18

*Brown v. Conn. Gen. Life Ins. Co.*,
  934 F.2d 1193 (11th Cir. 1991) .........................................................................13

*Byerson v. Equifax Info. Servs., LLC*,
  467 F. Supp. 2d 627 (E.D. Va. 2006) ................................................................25

*Delorenzo v. HP Enter. Servs., LLC*,
  79 F. Supp. 3d 1277 (M.D. Fla. 2015)...............................................................13

*Dendy v. Decker Truck Line, Inc.*,
  Civil Action No. 2:10cv459–MHT (WO),
  2010 WL 3398987 (M.D. Ala. Aug. 26, 2010) ..................................................21

*Eagle N. Am., Inc. v. Tronox, LLC*,
  No. 407CV131,
  2008 WL 189147 (S.D. Ga. Apr. 29, 2008).......................................................23

*Eakin v. Rosen*,
  CV215-42,
  2015 WL 8757062 (S.D. Ga. Dec. 11, 2015) ............................................... 17, 18

*Epstein v. Gray Television, Inc.*,
  No. 06-CV-431-WRF,
  2007 WL 295632 (W.D. Tex. Jan. 5, 2007); .....................................................23

*Gonzalez v. Pirelli Tire, LLC*,
  No. 07-80453-CIV,
  2008 WL 516847 (S.D. Fla. Feb. 22, 2008) ......................................................18

iii

*Hernandez v. Graebel Van Lines*,
  761 F. Supp. 983 (E.D.N.Y. 1991) ......................................................18

*I Create Int'l, Inc. v. Mattel, Inc.*,
  03 Civ. 3993 (JFK),
  2004 U.S. Dist. LEXIS 15477 (S.D.N.Y. Aug. 9, 2004) .....................17

*In re Ricoh Corp.*,
  870 F.2d 570 (11th Cir. 1989) ...........................................................16

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008)...............................................................21

*Kolodziej v. Mason*,
  Civil Action No. 1:10–CV–2012–JEC,
  2011 WL 2009467 (N.D. Ga. May 20, 2011).......................................24

*Lasher v. Day & Zimmerman Int'l Inc.*,
  No. Civ.A. 1:05-CV-02643,
  2006 WL 1518877 (N.D. Ga. May 30, 2006)............................... 14, 16

*Manuel v. Convergys Corp.*,
  430 F.3d 1132 (11th Cir. 2005) ............................................. 15, 22, 24

*Morrissey v. Subaru of Am., Inc.*,
  Case No. 1:15-cv-21106-KMM,
  2015 WL 9583278 (S.D. Fla. Dec. 31, 2015).......................................23

*Nam v. U.S. Xpress, Inc.*,
  Civil Action No. 1:10–CV–3924–AT,
  2011 WL 1598835 (N.D. Ga. Apr. 27, 2011).......................................22

*Phigenix, Inc. v. Genentech, Inc.*,
  No. 1:14-CV-287-MHC,
  2015 WL 10910488 (N.D. Ga. Mar. 12, 2015) ...................................16

*Royal Ins. Co. of Am. v. United States*,
  998 F. Supp. 351 (S.D.N.Y. 1998)......................................................25

*Seltzer v. Omni Hotels*,
  No. 09 CIV. 9115(BSJ)(JCF),
  2010 WL 3910597 (S.D.N.Y. Sept. 30, 2010).....................................17

*Spanx, Inc. v. Times Three Clothier, LLC*,
  No. 1:13-CV-710-WSD,
  2013 WL 5636684 (N.D. Ga. Oct. 15, 2013) ......................................................16

*Stat Med. Devices, Inc. v. Intrinsyk, LLC*,
  No. 15-20071-CIV-ALTONAGA/O'Sullivan,
  2015 WL 10960945(S.D. Fla. Dec. 1, 2015) ......................................................23

*Tansey v. City of Keller, Tex.*,
  No. 3:11–CV–03289–N (BF),
  2012 WL 2092935 (N.D. Tex. May 21, 2012),
  *report and recommendation adopted*,
  2012 WL 2092900 (N.D. Tex. June 8, 2012 ......................................................23

*Tommy Bahama Grp., Inc. v. Walking Co.*,
  Civil Action No. 1:07-CV-1402-ODE,
  2007 WL 3156254 (N.D. Ga. Oct. 19, 2007), ...................................................22

*United States ex rel. Elder v. DRS Techs., Inc.*,
  No. 2:11-CV-02097-RDP,
  2013 WL 3151171 (N.D. Ala. June 14, 2013)............................................ passim

*United States ex rel. Urquilla-Diaz v. Kaplan Univ.*,
  No. 8:07-cv-669-T-33TGW,
  2009 WL 763747 (M.D. Fla. Mar. 23, 2009) .....................................................13

*United States v. Nature's Farm Prods., Inc.*,
  00 Civ. 6593(SHS),
  2004 WL 1077968 (S.D.N.Y. May 13, 2004) ........................................ 13, 16, 17

*United States v. The Public Warehousing Company, K.S.C.*,
  Criminal Action No. 1:09-cr-00490-TWT-AJB,
  Dkt. 485 (N.D. Ga. Oct. 30, 2014)..................................................................8, 9

*Van Dusen v. Barrack*,
  376 U.S. 612 (1964) .........................................................................................13

*Watson v. Earthbound Holding, LLC*,
  No. 2:12–CV–2263–SLB,
  2012 WL 3775760 (N.D. Ala. Aug. 27, 2012) ...................................................21

*Williams v. Columbus Bar Ass'n*,
  Civil Action No. 1:12–CV–04382–RWS,
  2013 WL 1963822 (N.D. Ga. May 8, 2013)................................................. 18, 22

**STATUTES**

28 U.S.C. § 1391(b)(1)-(2) ...................................................................14

28 U.S.C. § 1391(c)(3).........................................................................12

28 U.S.C. §1404(a) ........................................................................ 12, 14

31 U.S.C. § 3730(b) .............................................................................2

31 U.S.C. § 3731(a) ...........................................................................25

31 U.S.C. § 3732(a) ...........................................................................14

## I.   INTRODUCTION

This is a case about a Kuwaiti company that contracted with an agency of the United States government located in Philadelphia, Pennsylvania.  According to the government's own allegations, Philadelphia—unlike Atlanta, or any other venue in the United States—is inextricably connected to each and every allegation of fraud in the complaint.  The prime vendor contracts ("PV Contracts") at the heart of the case were solicited from Philadelphia and negotiated there.  The government's Philadelphia-based personnel administered the contracts, and, most critically, these contracting professionals in Philadelphia approved each and every PWC price now at issue as "fair and reasonable" throughout the life of the contracts.  Indeed, the preponderance of factors evaluated by courts in the Eleventh Circuit when considering a transfer of venue strongly favors transfer of this case to the Eastern District of Pennsylvania:

*First*, Philadelphia, as the center of administration of PWC's PV Contracts, and the place where PWC sent all of the invoices for the contracts, is clearly the U.S. locus of operative facts in this case.  In contrast, the government has only identified a *single* supplier that *ever* had any ties to this District.

*Second*, the convenience of the parties and the witnesses strongly favors transfer because the contracting officers who were responsible for soliciting,

1

negotiating, and administering the PV Contracts were *and* are based at the Philadelphia headquarters of the primary nominal plaintiff in this case, the Defense Supply Center Philadelphia (the "Philadelphia Supply Center" or "DSCP").

*Third*, the interests of justice also strongly favor transfer because (a) as the home of DSCP, the Eastern District of Pennsylvania has the greatest interest of any district in the United States in this case's outcome; and (b) nationwide judicial efficiency would be increased because the civil docket in the Eastern District of Pennsylvania is significantly less congested than the docket of this District.

In short, the Eastern District of Pennsylvania is the most appropriate U.S. venue for this litigation. The Court should thus exercise its discretion to transfer this action to that district before the commencement of full-scale litigation.

## II. STATEMENT OF FACTS

### A. None of the Parties Are Located in the Northern District of Georgia; Nominal Plaintiff the Philadelphia Supply Center Is Located in the Eastern District of Pennsylvania.

#### 1. Relator Kamal Mustafa Al-Sultan

Kamal Mustafa Al-Sultan ("Relator") is a resident of Kuwait. (*See* Government's First Amended Complaint in Intervention ("FAC") ¶ 16.) Relator brought the current action on behalf of the United States and for himself, pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3730(b), by filing a *qui tam*

2

complaint in this Court under seal on November 18, 2005.  (*Id.*)  Relator subsequently filed a First Amended Complaint on September 25, 2006, and a Second Amended Complaint on October 1, 2009, both under seal.  (*Id.*)

### 2. Plaintiff the United States

The United States intervened in part and declined to intervene in part in this action, pursuant to the FCA, on November 13, 2009.  (Dkt. 65.)  On January 5, 2011, the United States filed its complaint in intervention.  (Dkt. 71.)  On September 30, 2011, the United States filed its FAC.  (Dkt. 78.)  The United States is suing on behalf of the Department of Defense ("DoD"), the Defense Logistics Agency ("DLA"), DSCP, and "any other Federal agencies which purchased or provided funds for the purchase of products and other services from the Defendants."  (FAC at ¶ 12.)

### 3. Nominal Plaintiffs DoD and DLA

The DoD is a department of the United States.  (FAC at ¶ 13.)  It is headquartered in Washington, D.C.  (*See* Declaration of Emily Ludmir Aviad "Aviad Decl." ¶ 3, Ex. A (DoD website).)  DLA is "DoD's largest combat support agency, providing worldwide logistics support to military services."  (FAC at ¶ 14.)  DLA is headquartered in Fort Belvoir, Virginia.  (Aviad Decl. ¶ 3, Ex. B (DLA website).)

### 4.  Nominal Plaintiff the Philadelphia Supply Center

DSCP is a "field activity of DLA."  (FAC ¶ 15.)  Headquartered in Philadelphia, it "provides the members of the U.S. military and other personnel with food," as well as other supplies and equipment.  (*Id.*)  DSCP is "responsible for managing DoD's prime vendor contracts for the purchase and supply of those commodities, including the prime vendor contracts for subsistence items at issue in this case."[1]  (*Id.*)  DSCP annually provides between $4.85 billion and $13 billion worth of food and other materials to U.S. troops and other customers worldwide. (Aviad Decl. ¶ 4, 6, Exs. C, E (article and report discussing DSCP's operations).) In recent years, DSCP has employed thousands of civilians and military personnel. (*Id.* ¶ 4-6, Exs. C, D, E (article and reports discussing number of civilians and military personnel employed by DSCP).)  DSCP also has long-standing roots in Philadelphia dating back to the early 1800s.  (*Id.* ¶ 7, Ex. F (DSCP website).)

### 5.  Defendant PWC

PWC is a warehousing and logistics corporation, with its headquarters in Kuwait City, Kuwait.  (*See* Declaration of Binoe Verghese ("Verghese Decl.") ¶ 3.)

---

[1]     In July 2010, DSCP was renamed DLA Troop Support.  (FAC ¶ 15.)  This brief will continue to refer to it as "DSCP," however, because that was the entity's name during most of the relevant period for this case.

6.  <u>Defendant The Sultan Center</u>

The Sultan Center Food Products Company, K.S.C. ("TSC") is one of the largest grocery and home products retailers in Kuwait and the surrounding regions, which has its headquarters in Kuwait City, Kuwait.  (*Id.* ¶ 21.)

**B.      PWC Contracted with the Philadelphia Supply Center to Supply Subsistence Items to U.S. Troops in the Middle East.**

PWC entered into three PV Contracts with DSCP for the provision of food to U.S. troops in Kuwait, Qatar, Jordan, and Iraq:  (1) an initial contract awarded in May 2003 (the "PV1 Contract"); (2) a "Bridge Contract" commencing in February 2005; and (3) a final contract awarded in July 2005 (the "PV2 Contract"). (Verghese Decl. ¶ 4; FAC ¶¶ 26-34.)  DSCP exercised options to extend the PV2 Contract in June 2007, June 2008, and June 2009.  (Verghese Decl. ¶ 5.)

DSCP managed all PV Contract negotiations, from the initial solicitation to the final contract awards.  (*Id.* ¶ 6.)  Indeed, the solicitations for the PV1 and PV2 Contracts both state that they were "Issued By" DSCP from a Philadelphia address. (*Id.* ¶ 6, Ex. 1 (PV1 Contract solicitation), Ex. 4 (PV2 Contract solicitation).)[2]

_____

[2]      This same Philadelphia address also appears in the "Issued By" entry on each of the PV Contracts, on the amendments to the PV1 and PV2 solicitations, and on the numerous modifications to both PV Contracts.  (Verghese Decl. ¶ 6, Ex. 2 (PV1 Contract), Ex. 3 (Bridge Contract), Ex. 5 (PV2 Contract).)

Throughout the negotiation and award process, PWC dealt almost exclusively with DSCP personnel in Philadelphia.  (*Id.* ¶ 7.)  PWC submitted its "Best and Final Offers" ("BAFOs") for the PV Contracts to Philadelphia-based DSCP personnel.  (*Id.* ¶ 7, Ex. 6 (PV1 BAFO cover letter and response), Ex. 7 (PV2 BAFO cover letter and response).)  And prior to PWC's submission of each BAFO, PWC and DSCP engaged in substantial communications regarding PWC's proposals.  (*Id.* ¶ 7, Ex. 8; *see also, e.g.*, *id.* ¶ 7, Ex. 6.)  These same Philadelphia-based contract officers ultimately awarded the contracts to PWC.  (*Id.* ¶ 8, Ex. 9 (PV1 Notice of Award), Ex. 5 (DiMeo signature page of PV2 Contract).)

### C. During Performance of the PV Contracts, PWC Submitted All Invoices and Updates to the Philadelphia Supply Center, Which Managed All Aspects of Contract Administration.

After award of the PV Contracts, DSCP continued as the locus of the PV Contracts' administration in the U.S.  (*See id.* ¶ 9, Exs. 1-5 (noting that the PV1 Contract, the Bridge Contract, and the PV2 Contract were to be "Administered By [DSCP]").)  DSCP's Philadelphia-based personnel were involved in every step of government contract administration, from the initial request for items through invoicing and price audits.  (*Id.* ¶¶ 9-19.)  For example, if DSCP wanted a new item added to the electronic catalog system from which the military ordered items, personnel in Philadelphia would ask PWC to provide a quote for the requested

item.  (*Id.* ¶ 10.)   After finding a supplier, PWC would provide DSCP with a source and quote.  (*Id.* ¶ 11.)  DSCP personnel in Philadelphia would then review the price quote for fairness and reasonableness.  (*Id.*)  Only after DSCP approved the price as fair and reasonable would the item be ordered by PWC and ultimately added to the electronic catalog system, where it was available for purchase by military customers in Iraq, Kuwait, Qatar, or Jordan.  (*Id.* ¶¶ 11-12.)

After military customers ordered items electronically, received them from PWC, and signed off on the invoice, a hard copy of the invoice—if available—was generally sent to PWC's finance or customer service department, which then submitted an electronic copy of the invoice to DSCP.  (*Id.* ¶¶ 13-14.)  DSCP personnel in Philadelphia then uploaded the invoice for final review, approval, and payment.  (*Id.* ¶ 14.)[3]

DSCP also oversaw the ongoing management of the PV Contracts, including by reviewing a variety of reports from PWC.  (*Id.* ¶¶ 16-17.)  In general, because of the distance and time zone difference, PWC and DSCP personnel typically communicated via email.  (*Id.* ¶ 19.)  But PWC also had at least nine face-to-face

---

[3]   Although the branch of the military that ultimately wired the payment to PWC was the Defense Finance and Accounting Services in Columbus, Ohio, this was a strictly mechanical process that only occurred after the military customer and DSCP had signed off on the invoice.  (Verghese Decl. ¶ 14.)

meetings with DSCP personnel in Philadelphia over the course of the PV

Contracts.[4]  (*See* Aviad Decl. ¶ 2; *see also* Verghese Decl. ¶ 18.)

### D.   The Vast Majority of Key Philadelphia Supply Center Witnesses Are Located in the Eastern District of Pennsylvania.

Given their essential role in contract award and administration, many DSCP

personnel will be key witnesses in this case.  In the related criminal case against

PWC, the government has (1) produced a DSCP-authored document that identified

for investigators 67 DSCP personnel—at least 57 of whom were based in

Philadelphia—as having been associated with the PV Contracts (Aviad Decl. ¶ 8,

Ex. G (attaching document)); and (2) revealed that it may call ten potential trial

witnesses who, as of October 2014, all were "current employees of [DSCP]."  *See*

*United States v. Public Warehousing Company, K.S.C., a/k/a Agility* ("*U.S. v.*

*PWC*"), Criminal Action No. 1:09-cr-00490-TWT-AJB, Dkt. 485, at 2 (N.D. Ga.

Oct. 30, 2014).  Notably, in oral argument and subsequent briefing on PWC's

motion to transfer venue in that case, the government did not identify a *single*

---

[4]    For example, at a meeting just after the PV2 Contract went into effect, PWC representatives and approximately 15 DSCP personnel met in Philadelphia to discuss Congressional complaints about other prime vendor contracts.  At that meeting, the head of DSCP asked PWC to reduce the price PWC was charging on certain items to prevent potential political pressure on DSCP.  (*See* Declaration of Matthew E. Sloan ¶ 2.)

witness from this District that it expects to call in the criminal trial.  (*See U.S. v.*

*PWC*, Dkt. 491, at 2 (Nov. 13, 2014).)

> **E.     The Relator Brought His *Qui Tam* Action in the Northern District**
> **of Georgia Despite This District's Tenuous Connection to the**
> **Events and People of this Case.**

On November 18, 2005, Relator filed his *qui tam* complaint under seal in

this District, alleging that PWC, TSC, and other individual defendants knowingly

presented false or fraudulent claims for payment to the United States government,

including improper overcharges for products purchased through the PV Contracts.

(*See* Relator's Original Complaint (Dkt. 1) ¶¶ 66-94.)  Relator's original complaint

focused exclusively on alleged overcharges for local market ready items and fresh

fruits and vegetables, which PWC purchased from suppliers outside the continental

United States ("OCONUS") —primarily from TSC.  (*Id.*)  **None of the operative**

**facts in Relator's original complaint took place in the Northern District of**

**Georgia.  (*Id.*)  Indeed, virtually all of the operative facts from Relator's initial**

**complaint that occurred in the United States—**namely, PWC's submissions to

DSCP, and DSCP's award and administration of the PV Contracts**—took place in**

**the Eastern District of Pennsylvania.  (***Id.* ¶¶ 14, 23, 25, 27-28, 31, 45, 47-50, 58,

61, 64, 67, 70, 83-84, 89.)  It was not until Relator's First Amended Complaint,

filed almost one year later, that any claims relating to products purchased from

9

suppliers in the continental United States ("CONUS" suppliers) appear, yet Relator again failed to specifically allege any material facts relevant to this District.  (*See* Relator's First Amended Compl. (Dkt. 13)  ¶¶ 99-109.)

The operative facts of the government's FAC, filed on September 30, 2011, are similarly focused almost entirely outside of this District.  The government's FAC describes two patterns of allegedly improper pricing practices by PWC: PWC allegedly (1) charged inflated prices for certain local market items in Kuwait, Iraq, and Jordan, and (2) failed to return certain rebates and discounts to DSCP. (FAC  ¶¶  3-8.)   Only  the  second  alleged  scheme  involves  suppliers  located anywhere in the U.S.  (FAC ¶¶ 80-95.)  Moreover, the focus of the FAC is not on the second, CONUS-related purported scheme (to which the FAC devotes only 15 paragraphs), but on the first (to which the FAC devotes a full 31 paragraphs), which involves suppliers located entirely in the Middle East, with no connections to this District.  (FAC ¶¶ 48-79; 80-95.)

### F.    Only One Supplier Mentioned in the FAC Had Any Ties to This District, and It No Longer Operates Here.

Over  the  course  of  its  PV  Contracts,  PWC  purchased  goods  from approximately 98 suppliers—approximately seventy of which were based in the continental U.S.  (Verghese Decl. ¶ 20.)  Of these domestic suppliers, however, the FAC identifies *only one*—Zartic, Inc.  ("Zartic")—with  any  apparent  ties  to

Georgia.  (FAC ¶ 92.)  Viewed in terms of total invoice value, purchases from Zartic accounted for only about 2.5% of the dollar value of all supplier purchases throughout the course of the PV Contracts.  (Declaration of Shakir Iqbal, ¶ 3.)  Moreover, it appears that Zartic no longer has any operations in this District.[5]  Defendant TSC, which is the supplier of *primary* focus in this case, also has no connections to this District.   As in Relator's complaint, virtually the only connection between the TSC-related allegations in the FAC and the U.S. is the Philadelphia Supply Center (*see* FAC ¶¶ 4-6, 10b, 61, 77, 98, 101, 104, 107, 110, 113), which received invoices for TSC products from PWC, and approved TSC's prices as "fair and reasonable."  Of the three remaining CONUS suppliers (other than Zartic) mentioned in the FAC, two—Barber Foods and Texas Best Trading LLC ("Texas Best")[6]—have their main U.S. presence closer to the Eastern District

---

[5]      After Zartic was acquired by Pierre Foods, Inc. ("Pierre Foods") (now AdvancePierre Foods, Inc.) in December 2006, Pierre Foods shut down Zartic's two food production plants in this District—first closing Zartic's Cedartown plant in 2008, then its Rome plant in 2010.  (Aviad Decl. ¶ 9, Exs. H, I, J, K (articles on acquisition of Zartic by Pierre Foods, shutdown of Zartic plants, and creation of AdvancePierre Foods, Inc.).)

[6]      Based on documents in PWC's possession, the company that the FAC refers to as "Texas Best Trading LLC" went by a variety of other names, including "Texas Best Foods" and "Texas Best Authentic Food Products."  (*See* Aviad Decl. ¶ 11, Ex. N.)

of Pennsylvania than to this District.  (*See* Aviad Decl. ¶¶ 10-11; Exs. L, M, N (articles, website, and email involving the locations and relevant corporate histories of Barber Foods and Texas Best).)   The fourth, Sara Lee Corporation ("Sara Lee"), now known as Hillshire Brands Company ("Hillshire Brands") and a subsidiary of Tyson Foods, Inc., has its headquarters in Chicago, Illinois, which is essentially equidistant from both districts.  (*See* Aviad Decl. ¶ 12; Exs. O, P, Q, R (articles involving the location and relevant corporate history of Sara Lee).)

## III.   ARGUMENT

### A.   Summary of Argument and Legal Standard

PWC does not contest that venue is proper in this District.[7]  Section 1404(a) of Title 28 provides, however, that venue may be transferred "for the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Here, because the U.S. locus of operative facts and the largest concentration of material witnesses are indisputably in Philadelphia, and any connections to the Northern District of Georgia are tenuous at best, this Court should exercise its broad discretion to transfer this action to the Eastern District of Pennsylvania.  District courts routinely

---

[7]     *See* 28 U.S.C. § 1391(c)(3) (providing that venue for a foreign defendant lies in any judicial district).

approve venue changes under Section 1404(a) in FCA cases where the locus of operative facts clearly lies outside the original district. *See, e.g.*, *United States ex rel. Elder v. DRS Techs., Inc.*, No. 2:11-CV-02097-RDP, 2013 WL 3151171, at *5 (N.D. Ala. June 14, 2013) (granting defendants' motion to transfer FCA action where "most, if not all events forming the basis of [relator's] claim occurred in either Afghanistan or [in the transferee forum]").[8]

"[T]he purpose of [Section 1404(a)] is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964); *Delorenzo v. HP Enter. Servs., LLC*, 79 F. Supp. 3d 1277, 1281 (M.D. Fla. 2015) (citation omitted). Under Section 1404(a), a district court has broad discretion to transfer a civil action to any other district where it might have been brought. *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d 1193, 1196-97 (11th Cir. 1991) ("The decision to transfer a case to another district is left to the sound

---

[8]     *See also United States ex rel. Urquilla-Diaz v. Kaplan Univ.* ("Kaplan Univ."), No. 8:07-cv-669-T-33TGW, 2009 WL 763747,*1 (M.D. Fla. Mar. 23, 2009) (granting defendants' motion to transfer FCA case where the original forum "is not the locus of operative facts"); *United States v. Nature's Farm Prods., Inc.*, 00 Civ. 6593(SHS), 2004 WL 1077968, at *5 (S.D.N.Y. May 13, 2004) (granting motion to transfer FCA case in part because locus of operative facts favored transfer).

discretion of the trial court"); *Lasher v. Day & Zimmerman Int'l, Inc.*, No. Civ.A. 1:05-CV-02643, 2006 WL 1518877, at *4 (N.D. Ga. May 30, 2006) (same). The facts and the applicable legal standards leave no doubt that this Court should exercise its discretion to transfer this action to Philadelphia.

Courts undertake a two-step analysis to determine whether transfer under Section 1404(a) is appropriate: "As a threshold matter, the court must consider if the case 'might have been brought' in the transferee court.'" *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1307 (N.D. Ala. 2003). "Second, the court must ask whether the balance of factors under §1404(a) weighs in favor of transferring this action to the transferee court." *Id.*

## B. Venue Is Proper in the Eastern District of Pennsylvania.

The first step of a Section 1404(a) analysis is to determine whether venue is proper in the transferee court. *A.J. Taft Coal Co.*, 291 F. Supp. 2d at 1307. "Venue is appropriate in 'a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.'" *Elder*, 2013 WL 3151171, at *2 (quoting 28 U.S.C. § 1391(b)(1)-(2)). A plaintiff may bring a claim under the FCA "in any district in which the defendant can be found, resides or transacts business, or in which any act proscribed by the [FCA] occurred." *Id.*; 31 U.S.C. § 3732(a). The government's complaint itself alleges that nominal plaintiff DSCP,

14

located in Philadelphia, was defrauded by PWC's alleged conduct.  Thus, there can

be no doubt that venue would be proper in the Eastern District of Pennsylvania.

### C.  The Balance of Factors Strongly Favors a Transfer to the Eastern District of Pennsylvania.

The Eleventh Circuit has identified nine factors that courts should consider

when weighing whether transfer is appropriate under Section 1404(a):

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005); *Elder*, 2013

WL 3151171, at *3.  In this case, the factors that are most significant for the Court's

consideration are the locus of operative facts (Factor 4); the convenience of the

parties and the witnesses (Factors 1 and 3); and the interests of justice, including

judicial efficiency and the forum's interest in the outcome of the proceedings

(Factor 9).[9]  All of these factors strongly favor transfer.

---

[9]    The nine factors need not be evaluated in the same order in which they are set forth in *Manuel*.  Many cases in the district courts of the Eleventh Circuit evaluate the *Manuel* factors in a different order that appears to mirror the significance of the particular facts of the case.  *See, e.g.*, *Elder*, 2013 WL 3151171,

*(cont'd)*

While "courts traditionally have accorded a plaintiff's choice of forum considerable deference" *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989), the plaintiff's choice of forum (*Manuel* Factor 8) is accorded less weight where, as here, "the forum lacks any significant connection with the underlying claim or operative facts and neither the plaintiff nor the defendant is a resident of that forum." *Lasher*, 2006 WL 1518877, at *4; *see also Bell v. K Mart Corp.*, 848 F. Supp. 996, 998 (N.D. Ga. 1994) (rejecting argument that court should honor plaintiff's choice of venue and granting transfer, where plaintiffs "presented no evidence tending to demonstrate inconvenience to the parties or witnesses by transferring venue").   As such, the government's choice of forum should be accorded minimal deference here.

1. The Locus of Operative Facts in the United States Is Indisputably Philadelphia (Factor 4).

"The locus of operative facts is traditionally an important factor to be considered in deciding where a case should be tried."  *United States v. Nature's Farm Prods., Inc.*, 00 Civ. 6593(SHS), 2004 WL 1077968, at *5 (S.D.N.Y. May 13, 2004); *see also Abramowitz v. Tropicana Atl. City Corp.*, No. 14-CV-2064

_____
*(cont'd from previous page)*
at 3-6; *Phigenix, Inc. v. Genentech, Inc.*, No. 1:14-CV-287-MHC, 2015 WL 10910488, at 6-10 (N.D. Ga. Mar. 12, 2015); *Spanx, Inc. v. Times Three Clothier, LLC,* No. 1:13-CV-710-WSD, 2013 WL 5636684, at 2-5 (N.D. Ga. Oct. 15, 2013).

(JS)(ARL), 2015 WL 1014511, at *4 (E.D.N.Y. Mar. 6, 2015) ("'The location of the operative events is a primary factor in a transfer motion.'") (citation omitted); *I Create Int'l, Inc. v. Mattel, Inc.*, 03 Civ. 3993 (JFK), 2004 U.S. Dist. LEXIS 15477, at *9 (S.D.N.Y. Aug. 9, 2004) (stating that "the locus of operative facts carries significant weight"). This factor "has been interpreted as the place where events and actors material to proving liability are located." *Eakin v. Rosen*, CV215-42, 2015 WL 8757062, at *10 (S.D. Ga. Dec. 11, 2015) (quotation marks and citation omitted); *Seltzer v. Omni Hotels*, No. 09 CIV. 9115(BSJ)(JCF), 2010 WL 3910597, at *4 (S.D.N.Y. Sept. 30, 2010) ("describing locus of operative facts as the 'site of the events from which the claim arises'") (citation omitted). Here, Philadelphia—as the center of award and administration of the contracts, the home of the vast majority of DSCP personnel with whom PWC transacted, and the place where all of PWC's invoices were reviewed and approved—is indisputably the U.S. locus of operative facts. *See Elder*, 2013 WL 3151171, at *5 (transferring FCA case in part where locus of operative facts was in transferee court).

Transfer is also warranted here because of the tenuous and minimal connection that *this* District has to the underlying facts, especially when the connection to the Eastern District of Pennsylvania is so strong. *United States v. Nature's Farm Prods.*), No. 00 Civ. 6593(SHS), 2004 WL 1077968, at *5

17

(S.D.N.Y. May 13, 2004) (transferring case in part because of "much weaker connection" to the operative facts than the transferee court); *Williams v. Columbus Bar Ass'n*, Civil Action No. 1:12–CV–04382–RWS, 2013 WL 1963822, at *3 (N.D. Ga. May 8, 2013) (transferring case in part because "the events taking place in Georgia are minimal"); *Eakin*, 2015 WL 8757062, at *10 ("Courts routinely transfer cases when the principal events occurred and the principal witnesses are located in another district.") (citations omitted).   Indeed, of the suppliers mentioned in the FAC, only *one*, Zartic, ever had any ties to this District, and Zartic no longer has manufacturing operations here.  (*See supra* at 10-11.)

2. The Convenience of the Parties and Witnesses Favors Transfer to the Eastern District of Pennsylvania, Where DSCP and the Vast Majority of Government Witnesses Are Located (Factors 1 and 3).

The convenience of the parties and the prospective witnesses also weighs strongly in favor of transferring this case to the Eastern District of Pennsylvania. *See Gonzalez v. Pirelli Tire, LLC*, No. 07-80453-CIV, 2008 WL 516847, at *2 (S.D. Fla. Feb. 22, 2008) ("'The convenience of both the party and non-party witnesses is probably considered the single most important factor in the analysis whether a transfer should be granted.'") (quoting *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 987 (E.D.N.Y. 1991)); *Bell*, 848 F. Supp. at 998-99 (granting

18

defendant's motion to transfer venue away from the Northern District of Georgia because none of the plaintiffs resided in Georgia).

First and foremost, DSCP, which is the principal party on whose behalf the government brought this lawsuit (*see* FAC ¶ 12), is based in Philadelphia.  Because DSCP's Philadelphia-based personnel solicited the PV Contracts, negotiated with PWC, and administered the contracts on a day-to-day basis for over seven years, these DSCP employees will be key witnesses in this matter, and it is beyond dispute that their home, Philadelphia, would be the most convenient forum for them.[10]  Indeed, the government itself has represented in the related criminal case that it may call ten witnesses from DSCP.  (*See supra* at 8.)  By contrast, it has failed to identify even a *single* witness it would call from this District in the criminal case.  (*Id.* at 8-9.)  Moreover, these witnesses, who ratified PWC's interpretation of the PV Contracts, may be key witnesses for PWC as well.  This further weighs in favor of transfer for the convenience of the witnesses.  To the best of PWC's knowledge, many of these DSCP witnesses remain involved in the

---

[10]    The other nominal plaintiffs, DLA and the DoD, are headquartered in Virginia and Washington, D.C., respectively, which are significantly closer to Philadelphia than to Atlanta, making the Eastern District of Pennsylvania more convenient for not only DSCP, but for the other nominal plaintiffs as well.

administration of important military contracts, so compelling them to travel to and from Atlanta for testimony would potentially disrupt a key government function.

For Defendants PWC and TSC, Georgia is no more convenient than Pennsylvania.  Both PWC and TSC are foreign companies, with their principal operations in Kuwait.  Moreover, many of PWC's and TSC's potential party witnesses would likely be coming from outside the United States, making both districts equally *inconvenient* for PWC and TSC, as well as for their respective party witnesses.

The convenience of non-party witnesses also favors transfer.  The CONUS suppliers discussed in the FAC would benefit from a transfer to Philadelphia:  Two of them—Barber Foods and Texas Best—have their main U.S. presence significantly closer to the Eastern District of Pennsylvania than to this District. (*See supra* at 11-12.)   A third, Sara Lee (now Hillshire Brands), has its headquarters in Chicago, which is essentially equidistant from both districts. (*supra* at 12.)  And Zartic, the only CONUS supplier mentioned in the FAC as having any ties to this District, no longer maintains an operating presence here. (*supra* at 10-11.)  By contrast, most of the witnesses from the non-party OCONUS suppliers—like Jordan Global, which is mentioned in the government's complaint (FAC ¶ 5, 76, 77, 110, 113)—would likely be coming from outside the U.S., which

means that the choice of forum between Philadelphia and Atlanta would likely have no material effect on their convenience.

Accordingly, the convenience of the parties and the material witnesses both strongly favor transferring to the Eastern District of Pennsylvania.

### 3.   Philadelphia Is the U.S. Location with the Most Significant Number of Relevant Documents in This Case (Factor 2).

Although the advent of electronic discovery has made the physical location of relevant documents less significant today than in the past, courts still consider this factor when assessing whether transfer is appropriate.[11]   Here, the largest concentration of relevant documents in the U.S. is indisputably located in Philadelphia, DSCP's headquarters.   Among other things, DSCP houses a large volume of relevant invoices and contract-related correspondence, and likely also possesses internal correspondence regarding contract interpretation and voluminous records on subsistence contracting in general, some of which may still be in hard copy documents.   No such document sources reside in this District.

---

[11]    *See, e.g.*, *Watson v. Earthbound Holding, LLC*, No. 2:12–CV–2263–SLB, 2012 WL 3775760, at *2, 3 (N.D. Ala. Aug. 27, 2012) (noting that the fact that "'access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous.'"); *Dendy v. Decker Truck Line, Inc.*, Civil Action No. 2:10cv459–MHT (WO), 2010 WL 3398987, at *2-3 (M.D. Ala. Aug. 26, 2010); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 316 (5th Cir. 2008).

    4.  <u>Trial Efficiency and the Interests of Justice Weigh Strongly in</u>
<u>Favor of Transfer to the Eastern District of Pennsylvania (Factor</u>
<u>9).</u>

Where, as here, the other *Manuel* factors counsel transfer, courts routinely

find that transfer also promotes the interests of justice and trial efficiency. *Tommy*

*Bahama Grp., Inc. v. Walking Co.*, Civil Action No. 1:07-CV-1402-ODE, 2007

WL 3156254, at *3 (N.D. Ga. Oct. 19, 2007).[12]   Indeed, the considerations courts

take into account to determine those interests of justice and efficiency largely

coincide with the other *Manuel* factors.  *See Nam v. U.S. Xpress, Inc.*, Civil Action

No. 1:10–CV–3924–AT, 2011 WL 1598835, at *12 (N.D. Ga. Apr. 27, 2011)

(noting that considerations going to the interests of justice include "'[a]ccess to

evidence, availability of witnesses, the cost of obtaining witnesses, the possibility

of a jury view, and all other practical problems that make trial of a case easy,

expeditious and inexpensive.'") (citation omitted) (alteration in original).

Moreover, the burden of imposing jury duty on a community with no

jurisdictional connection to the case favors transferring venue in the interests of

---

[12]    *See also Williams v. Columbus Bar Ass'n*, Civil Action No. 1:12–CV–04382–RWS, 2013 WL 1963822, at *3 (N.D. Ga. May 8, 2013) (holding that the interests of justice favor transfer because "[n]either party is a resident of Georgia[,] [k]ey witnesses and sources of proof" are located in transferee district, and "[t]he events taking place in Georgia are minimal.").

justice.  *See Morrissey v. Subaru of Am., Inc.*, Case No. 1:15-cv-21106-KMM, 2015 WL 9583278, at *4 (S.D. Fla. Dec. 31, 2015).[13]  Transfer is favored where the transferee court "has a strong local interest in deciding [the] controversy."  *See Stat Med. Devices, Inc. v. Intrinsyk, LLC*, No. 15-20071-CIV-ALTONAGA/O'Sullivan, 2015 WL 10960945, at *8 (S.D. Fla. Dec. 1, 2015). Thus, given the lack of connection to the Northern District of Georgia, Georgia's residents should not be burdened by serving on a lengthy jury trial for this case.  In contrast, as discussed above, Philadelphia has strong links to the operative facts, the witnesses, and to the primary nominal plaintiff in this case—DSCP.  Indeed, DSCP has extensive ties to Philadelphia, dating back to the early 1800s.  (*See supra* at 4.)  Today, DSCP handles between $4.85 billion and $13 billion worth of contracts around the world, and employs thousands of civilians and military

─────────────────

[13]     *See also Eagle N. Am., Inc. v. Tronox, LLC*, No. 407CV131, 2008 WL 1891475, at *5 (S.D. Ga. Apr. 29, 2008) (interests of justice favor transfer in part because "local residents here would be summoned to judge something that happened several states away"); *Tansey v. City of Keller, Tex.*, No. 3:11–CV–03289–N (BF), 2012 WL 2092935, at *3 (N.D. Tex. May 21, 2012) ("The unfairness of burdening citizens in an unrelated forum with jury duty also weighs in favor of transfer."), *report and recommendation adopted*, 2012 WL 2092900 (N.D. Tex. June 8, 2012); *Epstein v. Gray Television, Inc.*, No. 06-CV-431-WRF, 2007 WL 295632, at *7 (W.D. Tex. Jan. 5, 2007) (granting venue transfer motion and noting that "the Court does not desire to convene a jury in Texas when it should properly convene in South Carolina.").

personnel.  (*See supra* at 4. )  The Philadelphia community thus has a strong vested interest in the outcome of cases involving DSCP.

Finally, the comparative docket conditions of the Eastern District of Pennsylvania versus this District also favor transfer.  The civil docket in this District is significantly busier than the one in the Eastern District of Pennsylvania: as of December 31, 2015, the median time from filing to trial for civil cases in the Northern District of Georgia was 28 months, as compared to 17.1 months in the Eastern District of Pennsylvania.  (Aviad Decl. ¶ 13, Ex. S (table of District Court docket statistics.)  Moreover, as of June 2016, a judicial emergency in this District still exists; no such emergency exists in the Eastern District of Pennsylvania.  (*Id.* ¶ 14, Exs. T, U (judicial emergency definition and table of statistics); *see also Kolodziej v. Mason*, Civil Action No. 1:10–CV–2012–JEC, 2011 WL 2009467, at \*9 (N.D. Ga. May 20, 2011) (citing the judicial emergency as a reason for transferring a case out of the Northern District of Georgia).)

     5.  <u>The Remaining Transfer Factors Are Neutral and Do Not Favor Retaining the Case in the Northern District of Georgia.</u>

The remaining *Manuel* factors are neutral and therefore should not affect the Court's decision:

24

*The availability of process to compel the attendance of unwilling witnesses (Factor 5).*  The FCA gives parties the power to subpoena witnesses anywhere in the U.S.  *See* 31 U.S.C. § 3731(a).  Accordingly this factor is neutral.

*The relative means of the parties (Factor 6).*  PWC will incur virtually the same trial-related expenses whether the case remains in this District or is transferred.  And the government has the means to litigate in any U.S. district.  *See Royal Ins. Co. of Am. v. United States*, 998 F. Supp. 351, 354 (S.D.N.Y. 1998).  As such, this factor is neutral.

*A forum's familiarity with the governing law (Factor 7).*  All federal courts are presumed to be equally knowledgeable on matters of federal law.  *See, e.g.*, *Elder*, 2013 WL 3151171, at *6; *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006).  Thus, this factor is also neutral.

## IV.  CONCLUSION

For the foregoing reasons, Defendant PWC respectfully requests that the Court grant PWC's Motion to Transfer Venue to the Eastern District of Pennsylvania.

Dated:  July 18, 2016                 Respectfully submitted,

                                            s/ Richard Marmaro
                                            Richard Marmaro (admitted *Pro Hac Vice*)
                                            Cal. Bar No. 091387
                                            Matthew E. Sloan (admitted *Pro Hac Vice*)
                                            Cal. Bar No. 165165
                                            Emily Ludmir Aviad (admitted *Pro Hac Vice*)
                                            Cal. Bar No. 251995
                                            SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                                            300 S. Grand Avenue, Suite 3400
                                            Los Angeles, California  90071-3144
                                            Telephone:   (213) 687-5000
                                            Facsimile:   (213) 687-5600

Dated:  July 18, 2016                 Respectfully submitted,

                                            s/ Kristin N. Tahler
                                            Kristin N. Tahler (admitted *Pro Hac Vice*)
                                            QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                            865 S. Figueroa St., 10th Floor
                                            Los Angeles, California 90017
                                            Telephone:   (213) 443-3000
                                            Facsimile:   (213) 443-3100

Dated:  July 18, 2016                     Respectfully submitted,

                                          s/ Richard H. Deane, Jr.
                                          Richard H. Deane, Jr.
                                          Ga. Bar No. 214875
                                          Lucas W. Andrews
                                          Ga. Bar No. 019533
                                          JONES DAY
                                          1420 Peachtree Street, N.E., Suite 800
                                          Atlanta, Georgia  30309-3053
                                          Telephone:  (404) 521-3939
                                          Facsimile:   (404) 581-8330

                                          Attorneys for Defendant
                                          The Public Warehousing Company, K.S.C.

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

I hereby certify that this document has been prepared in Times New Roman 14-point font in accordance with Local Rule 5.1.

Dated:  July 18, 2016                 Respectfully submitted,

<div align="right" style="margin-left:40%">

s/ Richard Marmaro
Richard Marmaro

Attorney for Defendant
The Public Warehousing Company, K.S.C.

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I have caused a copy of the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filings to all counsel of record.

This 18th day of July, 2016.

s/ Richard Marmaro
Richard Marmaro