IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA Ex
Rel, et al.,

v.

THE PUBLIC WAREHOUSING
COMPANY K.S.C.
also known as
Agility, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:05-CV-2968-TWT

## OPINION AND ORDER

This is a qui tam action.  It is before the Court on the Defendants The Public

Warehousing  Company,  K.S.C.  ("PWC"),  The  Sultan  Center  Food  Products  Co.

K.S.C.,  and  Tarek  Abdul  Aziz  Sultan  Al-Essa's  Motions  to  Dismiss  the  First

Amended Complaint in Intervention of the United States of America pursuant to Rules

9(b) and 12(b)(6) [Docs. 163-1 & 182]. For the following reasons, the Defendants'

Motions to Dismiss [Docs. 163-1 & 182] are GRANTED in part and DENIED in part.

# I. Background

The United States alleges that the Defendants falsely billed the United States on three defense contracts to provide food and other subsistence items to American soldiers in Iraq and elsewhere in the Middle East. According to the United States' First Amended Complaint (the "Complaint"), PWC entered into three contracts between May 2003 and July 2005 with the Defense Supply Center Philadelphia ("Defense Supply Center"), an agency of the Department of Defense.[1]

## A. The Parties

The Defendant The Public Warehousing Company is a large, publicly traded Kuwaiti logistics company now known as Agility Public Warehousing Company K.S.C. PWC is headquartered in Sulaibiya, Kuwait. The Sultan Center Food Products Co. K.S.C. ("The Sultan Center") is a provider of various perishables and consumer goods, also headquartered in Kuwait, which PWC used to fulfill many of its orders related to the contracts at issue.[2]

---

[1]     United States' First Amended Complaint ¶ 26 [Doc. 78] (the "Complaint"). The Defense Supply Center is the troop support center agency of the Defense Logistics Agency itself a logistics combat support agency within the Department of Defense.

[2]     Relator's Original Complaint ¶¶ 3-5 (the "Relator's Complaint").

## B. The Contracts

The Defense Supply Center issued a solicitation for the first contract, known as the PV-1 Contract, on May 10, 2002.[3] PWC submitted a bid for the PV-1 Contract, which was accepted and entered into with an effective date of May 28, 2003. It required PWC to acquire and distribute subsistence items to U.S. military personnel located in Kuwait and Qatar.[4] On June 27, 2003, the Defense Supply Center issued a modification which added Iraq to the contract, which it noted could potentially increase the estimated value of the contract by up to 1,200 percent.[5] The Defense Supply Center paid PWC in excess of $1.4 billion over the life of the PV-1 Contract.[6]

Just over one year later, on September 3, 2004, the Defense Supply Center issued another solicitation for a prime vendor contract, known as the PV-II Contract.[7] PWC submitted an initial bid on November 16, 2004.[8] In order to avoid a discontinuation of services, the Defense Supply Center awarded PWC a temporary

---

[3]    Compl. ¶ 27.

[4]    Id. at ¶¶ 27-28.

[5]    Id. at ¶ 29.

[6]    Id. at ¶ 30.

[7]    Id. at ¶ 31.

[8]    Id. at ¶ 32.

bridge contract (the "PV-Bridge Contract") while the PV-II Contract bid process was finalized.[9] On July 7, 2005, the Defense Supply Center awarded the PV-II Contract to PWC with an effective date of June 3, 2005, though PWC continued to provide services under the PV-1 Contract until December 15, 2005.[10] Through October 2010, the Defense Supply Center had paid PWC over $7.3 billion on the PV-II Contract, and $1.1 billion on the PV-Bridge Contract.[11] All told, the Complaint alleges that the Defense Supply Center has paid PWC in excess of $9.8 billion for claims arising under all three contracts through October 2010.

All three contracts contained the same contractual language regarding how PWC was to invoice the Defense Supply Center. Under the contracts, PWC was to invoice the "unit price" for each product delivered, which was comprised of two components: "delivered price" and "distribution price."[12] The "delivered price" was whatever PWC paid its "manufacturer/supplier" to get the product to a distribution point. The "distribution price" was supposed to be a fixed fee set by PWC which covered all of its overhead, transportation expenses, etc. The only variable cost which

---

[9]     Id. at ¶ 33.

[10]    Id. at ¶ 34.

[11]    Id. at ¶¶ 35-36.

[12]    Id. at ¶¶ 37-38.

could change, therefore, was the actual amount paid to a "manufacturer/supplier" to deliver the product. The contracts also required PWC to return to the Defense Supply Center any rebates or discounts it received as a direct result of the contracts.[13]

## C. The Alleged Schemes

The Plaintiffs allege that the Defendants participated in two different schemes to defraud the United States. The first scheme involved products purchased outside the continental United States. The contracts required PWC to purchase perishable goods on the local market, products called Local Market Ready Items or LMRI. When PWC received orders from the Defense Supply Center for these local market items, PWC typically called upon the Defendant The Sultan Center to fulfill them. The Sultan Center would then purchase the LMRI from local producers and invoice the cost to PWC.[14]

The Complaint states, however, that The Sultan Center substantially marked up the prices it had paid local manufacturers and suppliers for the LMRI. According to the Complaint, the Defendants knew that the prices were inflated, and knew the price The Sultan Center had actually paid, but billed the Defense Supply Center at the inflated price anyway. The Plaintiffs argue that PWC should have billed the lower

---

[13]    Id. at ¶¶ 38-45.

[14]    Id. at ¶¶ 48-51.

price because they maintain that The Sultan Center was not a "manufacturer/supplier" as defined by the contract.

The second scheme involved "prompt payment" discounts which were never passed along to the government. According to the Complaint, The Sultan Center and PWC had an agreement for PWC to receive a ten percent discount on the inflated price.[15] The two parties called this discount a "prompt payment" discount, stating that it was given to PWC for paying invoices earlier than required. Because of that, the Defendants argue that the payments were not directly attributable to the PV Contracts, and, therefore, PWC did not have to rebate them to the United States. The Complaint alleges, however, that often these discounts were given regardless of whether payments were made early, on time, or even in some circumstances, late.[16]

### D. Procedural History

The Relator in this case, Kamal Mustafa Al-Sultan, was a former business partner of PWC who initially filed this *qui tam* case in November 2005. The Relator

---

[15]    This scheme also allegedly extended beyond The Sultan Center to PWC's other "manufacturers/suppliers" both abroad and here in the United States. Id. at ¶¶ 80-96. Among PWC's American vendors were: the Sara Lee Corporation (now Hillshire Farms), headquartered in Illinois; Texas Best Trading LLC, headquartered in Maryland; Barber Foods, headquartered in Maine; and Zartic, Inc., which was located in Rome, Georgia, but has since been acquired and had its Georgia facilities shuttered.

[16]    Id. at ¶¶ 51-79.

then filed amended complaints on September 25, 2006 and October 1, 2009. In his complaints, the Relator alleged ten different counts against all of the Defendants. On November 13, 2009, the United States elected to intervene in part and declined to intervene in part. The United States intervened in the counts against PWC and The Sultan Center relating to the inflated prices and unreported discounts PWC allegedly claimed. The United States declined to intervene against the Defendants Switzer and Al-Saleh. The Defendants PWC and The Sultan Center now move to dismiss the United States' First Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.[17] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."[18] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most

---

[17]    Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

[18]    Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).

favorable to the plaintiff.[19] Generally, notice pleading is all that is required for a valid complaint.[20] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.[21]

Rule 9(b), however, adds a heightened pleading requirement to Rule 12(b)(6) when the plaintiff is alleging claims based on fraud. Under Rule 9(b), the plaintiff must state "with particularity the circumstances constituting fraud..."[22] In order to satisfy this particularity requirement, the complaint must state:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.[23]

---

[19]    See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").

[20]    See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).

[21]    See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 550 U.S. at 555).

[22]    Fed. R. Civ. P. 9(b).

[23]    U. S. ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1310 (11th Cir. 2002).

In other words, the plaintiff must allege the who, what, where, when, and how of each element, except scienter, which can be pleaded generally.[24] Rule 9(b)'s standard does not require a plaintiff "to actually prove his allegations."[25] But in order to prevent claims of fraud from being too easily made, the plaintiff must offer some "indicia of reliability" that he can prove what the complaint alleges.[26]

### III. Discussion

### A. False Claims Act

The United States has alleged six different counts of violations of the False Claims Act ("FCA")[27] against the Defendants. The first four counts refer to PWC's use of allegedly inflated invoices from The Sultan Center in its claims for payment.[28] The last two counts refer to the discounts that were allegedly given to PWC by The

---

[24]   See Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005). See also Fed. R. Civ. P. 9(b).

[25]   Clausen, 290 F.3d at 1313.

[26]   Id. at 1311.

[27]   31 U.S.C. § 3729.

[28]   Compl. ¶¶ 97-108. Some of the counts are repeated because the Defendants' allegedly fraudulent claims were submitted before and after changes to the FCA became effective in 2008 and 2009. As far as this case is concerned, the changes were not substantive. For simplicity's sake, therefore, the Court will hereinafter refer only to the most recently updated version of the Code.

Sultan Center and others.[29] The FCA, among other things, imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."[30] The FCA also imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[31]

### 1. Presentment (Counts 1, 2, 5 and 6)

The Defendants argue that the United States' claims which rely on Section (a)(1)(A) of the False Claim Act should be dismissed because the Complaint fails to plead with the particularity required by Rule 9(b) that false claims were actually presented to the government. According to the Defendants, the Rule 9(b) standard articulated in <u>Clausen</u> requires at a minimum that the United States attach examples of actual claims for payment submitted by the Defendants. Because the United States did not attach any invoices that either misrepresented The Sultan Center's role or mischaracterized the nature of the discounts PWC received from The Sultan Center, the Defendants argue that the government has failed to plead presentment.

The Defendants' argument is wrong for two reasons. First, the Defendants

---

[29]   <u>Id.</u> at ¶¶ 109-114.

[30]   31 U.S.C. § 3729(a)(1)(A).

[31]   <u>Id.</u> § 3729(a)(1)(B).

completely misread <u>Clausen</u>. <u>Clausen</u> requires a plaintiff to provide "some indicia of reliability" to support the assertion that an actual claim was presented to the government.[32] Because the actual submission of a claim is the "*sine qua non* of a False Claims Act violation," a plaintiff cannot "merely...describe a private scheme in detail but then...allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted."[33] The purpose of this requirement is, of course, to prevent frivolous claims by private plaintiffs who have no evidence that a defendant actually defrauded the government. Oftentimes, especially in situations where the government has declined to intervene, this can be shown by providing examples of actual claims that were submitted.[34]

Contrary to the Defendants' contention, however, actual invoices are not required. While <u>Clausen</u> acknowledges that the submission of actual invoices would satisfy Rule 9(b), the Court also goes out of its way to make clear that it "merely lists some of the types of information" that might have been helpful, "but does not mandate

---

[32]     <u>Clausen</u>, 290 F.3d at 1311.

[33]     <u>Id.</u>

[34]     <u>See, e.g.</u>, <u>U.S. ex rel. Feingold v. Palmetto Gov't Benefits Administrators</u>, 477 F. Supp. 2d 1187, 1196 (S.D. Fla. 2007), aff'd sub nom. <u>Feingold v. Palmetto Gov't Benefits Adm'rs</u>, 278 F. App'x 923 (11th Cir. 2008) (dismissing an FCA claim where the relator failed to point to specific examples of fraudulent claims submitted or approved the defendant. The court noted that the relator did not include "an actual report.").

all of this information for any of the alleged claims."[35] And as the Eleventh Circuit has since made clear, "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim."[36] The consistent standard, rather, is whether the plaintiff has provided some "indicia of reliability."[37] In other words, a plaintiff must "at a minimum...explain the basis for her assertion that fraudulent claims were actually submitted."[38] As such, particularity under Rule 9(b) is assessed on a case-by-case basis.

With that standard in mind, there is no question that the Complaint sufficiently pleads presentment. First-hand knowledge can oftentimes provide a relator with a sufficient basis for his presentment allegations.[39] This is only more pertinent when the plaintiff is the government. As a party to the actual submission of the allegedly false claims, the government is not saying that the Defendants "must have" or "likely"

---

[35]     Id. at 1312 n.21.

[36]     U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014). Though this case was unpublished, and therefore non-binding, the Court nonetheless finds it persuasive.

[37]     Clausen, 290 F.3d at 1311.

[38]     Mastej, 591 F. App'x at 704.

[39]     Id. ("Although there are no bright-line rules, our case law has indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims.")

submitted claims, as the relator did in <u>Clausen</u>.[40] Rather, the government is saying that the claims were actually submitted, and it knows this because the claims were actually submitted to the United States. The Complaint also provides numerous details about the claims, including that the claims for payment were submitted by PWC between 2003-2009, PWC used prices supplied to it by The Sultan Center in its claims for payment, and the United States also included an exhibit which contained a detailed list of the different orders PWC sent to the United States. The invoices also failed to include discounts PWC had received from The Sultan Center and other companies. Coupled with the government's first-hand knowledge, these details provide more than enough "indicia of reliability" to satisfy Rule 9(b).

The Defendants also misread the Complaint itself. The Defendants argue that the Complaint fails to allege how PWC actually mischaracterized its claims. But this view of the Complaint only makes sense if one reads the Complaint with the necessary assumptions friendly to the Defendants' position, namely, that The Sultan Center is actually a "manufacturer/supplier" and that the discounts at issue were actually for prompt payment. If those two things are true, then yes, the United States has failed to show how the Defendants' claims were false. But the Defendants ignore that the government has in fact said the exact opposite is true. According to the Complaint,

---

[40]     See <u>Clausen</u>, 290 F.3d at 1311.

The Sultan Center is *not* a "manufacturer/supplier" and the prompt payment discounts were *not* actually given for prompt payment. Both of those contentions are backed up by specific factual allegations.[41] And contrary to The Sultan Center's argument, the Complaint shows that The Sultan Center caused the claims to be submitted by knowingly participating in the two schemes and providing PWC with the invoices and discounts which the Defendants used to defraud the United States.

Ultimately, the Defendants are trying to shoehorn an argument about presentment into a case where it is inappropriate. Presentment is normally an issue when a relator makes wild claims about fraud, but cannot show whether or not those supposedly fraudulent claims were actually submitted to the government. In this case, however, neither party denies that claims were submitted to the government. And both parties agree that, for example, the submitted claims were based on invoices provided by The Sultan Center and that the claims did not include the "prompt payment" discounts. The core issue in this case is not whether the claims for payment were presented to the government, but whether those claims were false. Considering that neither party disputes that claims were actually submitted, and that the Court finds that the Complaint sufficiently pleads presentment regardless, dismissal on this ground is

---

[41]    See, e.g., Compl. ¶¶ 54, 74, 87, 93.

not warranted.[42]

## 2. Materiality (Counts 1-6)

The Defendants next argue that the Complaint fails to adequately plead that the alleged misrepresentations were material. In order for a misrepresentation about compliance with a contractual requirement to be actionable under the FCA, the misrepresentation must be material.[43] "The materiality standard is demanding."[44] The FCA defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[45] The Supreme Court has taken this definition to be equivalent to the common law understanding.[46] In both the common law and FCA understandings of materiality, one "look[s] to the effect on the

---

[42]    Even if the parties did not agree on that point, as the Court discusses above, the Complaint contains more than enough "indicia of reliability" to satisfy Rule 9(b).

[43]    Universal Health Servs., Inc. v. United States (Escobar), 136 S. Ct. 1989, 2002 (2016).

[44]    Id. at 2003.

[45]    31 U.S.C. § 3729(b)(4). This language does not appear in the original version of the statute. However, as explained above, the FCA's inclusion and definition of materiality simply incorporate the common law view. Though the language was not present prior to 2009, courts incorporated a common law materiality requirement into the statute anyway. See U.S. ex rel. Matheny v. Medco Health Sols., Inc., 671 F.3d 1217, 1222 (11th Cir. 2012).

[46]    Escobar, 136 S. Ct. at 2002.

likely or actual behavior of the recipient of the alleged misrepresentation."[47] Absent special knowledge, if a misrepresentation is such that it would reasonably change a person's decision making process, then it is material.

Evidence of past behavior is certainly relevant to this inquiry. As the Supreme Court noted in <u>Escobar</u>, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."[48] Indeed, the Defendants rest much of their argument on this sentence. According to the Defendants, because PWC supposedly disclosed The Sultan Center's role as its "supplier" in its proposals, that the government had full knowledge of the alleged misrepresentation. And because the government continued to pay under the contracts, the Defendants argue that the alleged misrepresentations could not possibly be material.

The Court disagrees for three reasons. First, the Defendants once again ignore the facts alleged in the Complaint. The government does not dispute that it knew PWC was using The Sultan Center as a "supplier," or that "prompt payment" discounts were allowed by the PV Contracts. But the fundamental claim of the Complaint is that the Defendants *lied*. According to the government, The Sultan Center was not a supplier

---

[47]    <u>Id.</u> at 2002.

[48]    <u>Id.</u>

and the "prompt payment" discounts were not for prompt payment. Regardless of whether the government was aware of PWC using The Sultan Center, unless the government knew about the Defendants' alleged *deception*, the government could not have the knowledge necessary to undermine materiality.

The Defendants argue, however, that even if the Defense Supply Center was not put on notice by the contract proposals, the "government" was put on notice once the Relator filed his original Complaint.[49] But just because one agency within the vast bureaucracy of the federal government has knowledge of a contractor's wrongdoing does not mean that the Defendants have a "government knowledge" defense. The issue is whether the actors actually involved in the contractual relationship are aware of the alleged fraud.[50]

In this case, the agency that became aware of the allegations when the Relator filed his original Complaint was the United States Attorney's Office, which is a branch of the Department of Justice, a completely different Cabinet Department from that of the Department of Defense. The Defense Supply Center and the United States

---

[49]     PWC's Mot. to Dismiss, at 37 [Doc. 163-1].

[50]     Cf. U.S. ex rel. Ubl v. IIF Data Sols., 650 F.3d 445, 453 (4th Cir. 2011) (finding agency's knowledge relevant even though they were not the agency that actually awarded the contracts because the defendant was "working so closely with the [agency] on the very contracts" that were the subject of that litigation).

Attorney's Office have no regular interaction with each other, and the United States Attorney's Office had no regular contact with PWC during its performance of the contracts. Even if it did, mere suspicion of wrongdoing is not enough. The appropriate time to impute knowledge is at the end of an investigation, not at the beginning. And in this case, once the United States Attorney's Office's investigation was complete and the government decided to intervene, the Defense Supply Center promptly terminated its relationship with PWC.

Third, the Defendants assume that once fraud is discovered, the government is then required to stop continuing payments or lose its right to enforce the FCA. But even if the Defense Supply Center was aware of the Defendants' alleged fraud, there are "instances in which a government entity might choose to continue funding the contract despite earlier wrongdoing by the contractor."[51] The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense. "To find otherwise could lead to perverse outcomes; the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate

---

[51]     U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 917 (4th Cir. 2003).

the contract (and the less likely the contractor would be held liable)."[52] The contracts at issue in this case were for the procurement of necessary supplies for American troops in an active theater of war. A contract could hardly be more essential to an important government interest than that.

In addition to their "government knowledge" arguments, the Defendants also argue that the Complaint does not plead materiality with sufficient particularity. Because the word "material" only appears four times in the Complaint, and in those circumstances is only used in a conclusory manner, the Defendants argue that the government did not plead materiality with sufficient particularity. This argument clearly ignores the other facts pleaded in the Complaint. Particularity is not met or unmet by the presence or absence of the magic word "material" in connection with a fact, but by pleading facts which by their nature support a finding of materiality. In this case, the United States has alleged a number of facts to support its claim that the Defendants participated in a scheme to charge the United States inflated prices for supplies and split the profits among themselves. Taking those facts as true, such actions on the part of the Defendants would clearly be material to the United States' decision to pay on the contracts. The fact that it did not describe in the Complaint how

---

[52]   U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l, 600 F. App'x 969, 978 (6th Cir. 2015).

each of these facts would go toward proving materiality is irrelevant.

The Defendants finally argue that the misrepresentations could not have been material to the government because each of the invoices was supposedly approved by an officer the Defense Supply Center as "fair and reasonable." The United States alleges that the responsible officer did not have all material facts required to be able to make a determination of "fair and reasonable" because the Defendants lied. Just as importantly, "fair and reasonable" is merely an approval of the price in the abstract. But the abstract price is not the fundamental issue in this case; how that price was reached is. Even if the price from The Sultan Center was a "fair and reasonable" price for the supplies, it is not the price the government would pay if The Sultan Center is not a "supplier." The heart of the bargain between the government and PWC is that the government would pay the *contract* price, not a "fair and reasonable" one. For all of these reasons, the Court concludes that the United States sufficiently alleged the material nature of the claims for payment.

### 3. Scienter and Falsity (Counts 1-6)

The core of the Defendants' argument regarding the FCA claims centers on the dual issues of scienter and falsity. In order to violate the FCA, a claim for payment must not only be both false in some way, but the defendant must also know that it was false. Knowledge under the FCA can be actual knowledge of falsity, but it can also be deliberate ignorance or reckless disregard for the truth or falsity of the information.[53] Even under the heightened pleading standards of Rule 9(b), knowledge "may be alleged generally."[54] The Complaint alleges that the Defendants knew that PWC's claims for payment were: (1) based on inflated invoices from The Sultan Center and (2) did not include "prompt payment" discounts PWC received from The Sultan Center and others. This is enough for the United States to meet its burden under Rule 9(b) regarding scienter.

Falsity is less clear. The statute does not define "false" or "fraudulent." But courts have found that statements can be either factually or legally false. Factually false statements occur when a "supplier falsely bills the government for something not received."[55] There is no question, in this case, about the goods that the United States

---

[53]    See 31 U.S.C. § 3729(b)(1).

[54]    Fed. R. Civ. P. 9(b).

[55]    United States ex rel. Phalp v. Lincare Holdings, Inc., 116 F. Supp. 3d 1326, 1344 (S.D. Fla. 2015).

received. All parties acknowledge that the United States received what it was billed for.

Instead, the Untied States alleges that the claims were legally false, meaning that "the supplier has falsely certified compliance" with some sort of legal requirement, be it regulatory, statutory, or contractual, "but nevertheless has submitted a claim."[56] Certification can be given either expressly or impliedly. There is no allegation in the Complaint that PWC expressly certified in its claim for payment that it was in compliance with the PV Contracts. Rather, the United States alleges that the Defendants' claims were false because they failed to disclose that they were not in compliance and sought payment anyway. This is known as the implied certification theory. The Supreme Court in <u>Escobar</u> recently endorsed the implied certification theory, as long as two conditions are satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."[57]

### a. Scheme 1 - Inflated LMRI prices

---

[56]      <u>Id.</u> at 1345.

[57]      <u>Escobar</u>, 136 S. Ct. at 2001.

The Complaint alleges two separate schemes that the Defendants apparently used. The first scheme, using invoices from The Sultan Center involves essentially a matter of contract interpretation. PWC argues that it disclosed The Sultan Center's role as a "manufacturer/supplier" in its proposals, and that the PV Contracts were "best value" not "lowest price" contracts. But The Sultan Center addresses the issue more precisely when it argues that the Defendants were operating under a reasonable interpretation of the terms "manufacturer/supplier." It does not matter whether the contracts were "best value" or "lowest price" contracts because, as the Court discussed previously, the dispute is not truly about the price in the abstract. Nor is the issue whether the government was aware of The Sultan Center's role in the contracts. Rather, the principal issue is whether The Sultan Center is a "manufacturer/supplier" as understood in the contracts.

To decide that issue, the Court must look to the PV Contracts themselves.[58] The PV Contracts defined the "Delivered Price" as the "manufacturer/supplier's actual invoice price to deliver the product to" PWC's facilities.[59] PWC's Proposal, on the

---

[58]     Though the PV Contracts and related Proposals were not attached to the Complaint, they are central to the Complaint and to the government's allegations. Because there is no dispute as to the accuracy or contents of the PV Contracts and related Proposals, the Court may "properly consider" them. See Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999).

[59]     Def.'s Mot. to Dismiss, Ex. 1 at 11 [Doc. 163-2].

other hand, defined Delivered Price as "the actual last invoice price of a product PWC pays a manufacturer, *distributor* or supplier for that product..."[60] PWC argues that because the government did not object to its definition of Delivered Price, it must have either been incorporated into the PV Contracts, or at the very least the government knew that PWC was operating under that definition. PWC fails to mention, however, that the PV Contracts also had a supremacy clause in them, which stated that the contract language controlled in case there were any inconsistencies with other documents.[61] Therefore, the contracts' definition is the relevant one here, not PWC's.

This principal issue then boils down to what it means to be a "manufacturer/supplier." The PV Contracts, unfortunately, never go on to define the term. The Defendants argue that The Sultan Center is a supplier because it "supplies" PWC with the materials it orders. The government, meanwhile, contends that The Sultan Center is not a supplier because it merely purchased products from local manufacturers. As such, The Sultan Center was a "distributor," or a middleman, as opposed to a "manufacturer/supplier" as intended by the contracts.[62]

On the one hand, the usual definition of a supplier as one who supplies could

---

[60]     Def.'s Mot. to Dismiss, Ex. 2 at 12 [Doc. 163-4] (emphasis added).

[61]     Def.'s Mot. to Dismiss, Ex. 1 at 95 [Doc. 163-2].

[62]     See Compl. ¶¶ 48-56.

easily encompass The Sultan Center's role in the PV Contracts. After all, it did
"supply" PWC in that it provided PWC with the goods it ordered. On the other hand,
however, the Defendants' interpretation of supplier would mean that the Defendants
could use as many middlemen as they wanted, driving up the final cost to the
government, as long as they provided goods to PWC. That does not seem to square
with the intent of the parties when looking at the contract as a whole. The Defendants
alternatively argue that because the government did not object to their definition of
Delivered Price, that should be evidence that they incorporated a definition which
included "distributor." But that evidence cuts both ways. The government's refusal
to include the language can also be read as explicit disagreement with PWC's
definition. And the fact that PWC included "distributor" in its definition at all would
seem to indicate that a distributor is different than a supplier. This is further supported
by the allegations in the Complaint, which show that PWC consistently referred
internally to The Sultan Center as a consolidator and distributor. More evidence is
needed, and as such it is inappropriate to conclusively determine the contract language
at the motion to dismiss stage.

### b. Scheme 2 -- "Prompt Payment" Discounts

Even if the contract language regarding "manufacturer/supplier" remains
unclear, the language regarding discounts is not. The PV Contracts contained

provisions which required PWC to return rebates and discounts to the government "when they are directly attributable to sales resulting from orders exclusively submitted by the Defense Supply Center or its customers."[63] In addition to that requirement, the PV Contracts also required that PWC submit Monthly Rebate Reports to the Defense Supply Center detailing all rebates and discounts directly attributable to sales.[64] The Complaint alleges that the second scheme between the PWC and The Sultan Center, as well as other "suppliers," involved discounts which were given to PWC in return for its business but were not passed on to the government. The Complaint also alleges that PWC never disclosed these discounts in its invoices or in its reports.

Taking these allegations as true, the claims for payment submitted by PWC would be clearly false under the implied certification theory. Every time PWC submitted an invoice, a reasonable person would view that invoice as a statement that the price charged is the price actually owed. If there were discounts that should have been applied to the bill but which were not, especially given its contractual obligations, then that invoice is false. While this would be true on the strength of the invoices alone, PWC also submitted monthly reports that did not include the "prompt

---

[63]    Compl. ¶¶ 43-44.

[64]    <u>Id.</u> at ¶ 45.

payment" discounts. The omission of those discounts, if they were directly attributable to the government's orders, would clearly render their statements false. Now, the Defendants for their part argue that the discounts were for "prompt payment," and as a result were not directly attributable to the PV Contracts. But the question of whether the discounts were for prompt payment or not is a question of fact. Because the Complaint alleges that the discounts were actually attributable to the contracts, and because the Court must take the allegations as presented in the Complaint as true, the Court finds that the claims for payment were false.

Thus, while the issue remains what the contract term "manufacturer/supplier" means, the Court concludes that the government pleaded facts to allege that the Defendants failed to pass along discounts to the government sufficient to satisfy the heightened pleading standards of Rule 9(b). Such an omission is clearly material, and there is no doubt that claims were actually presented to the government for payment. For these reasons, and those discussed above, the Court finds that Complaint sufficiently alleges a claim under the False Claims Act.

**B. Common Law Claims**

**1. Common Law Fraud (Count 7)**

"The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or

refrain from acting; (4) justifiable reliance; and (5) damages."[65] Like the FCA claims, common law fraud claims must also meet the heightened pleading standard of Rule 9(b). The Defendants largely parrot the same arguments against the fraud claims as they did against the FCA claims. Like the FCA claims, the Defendants' arguments fail.

As the Court discussed previously, the Complaint alleges that the Defendants used inflated invoices to bill the government and failed to report discounts which were directly attributable to the government's purchase orders, all in violation of the PV Contracts. The Complaint also alleges that the Defendants did so in full knowledge as part of a scheme to receive higher payments from the government than what they were owed, and that the government paid them accordingly based upon the Defendants' representations. For those reasons, and for the reasons discussed previously, the Court finds that the Complaint sufficiently alleges common law fraud in accordance with the heightened pleading requirements of Rule 9(b).

### 2. Payment By Mistake And Unjust Enrichment (Counts 8 and 9)

The United States also pleads two equitable claims of payment by mistake and unjust enrichment. Payment by mistake, known as money had and received in Georgia, is "merely one form of action to recover damages based on unjust

---

[65]     Lehman v. Keller, 297 Ga. App. 371, 372-73 (2009).

enrichment."[66] "The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."[67] Thus, unjust enrichment is "available only when there is no legal contract."[68]

It is clear that there is an express contract between these two parties; neither party disputes that fact. The United States argues that it may assert alternative and inconsistent claims at this stage of the litigation, but "it cannot claim within a single count that there was an agreement and that the [Defendants were] unjustly enriched." In addition to incorporating all of its preceding allegations, the United States' unjust enrichment claim alleges that "The United States made payments to Defendant PWC, which in turn made payments to TSC, *under the PV-I Contract, the Bridge Contract and the PV-II Contract*..."[69] Because neither side disputes the existence of the contracts, and because the government's equitable claims arise under the terms of those contracts, the equitable claims are improper, and dismissal is warranted.

---

[66]   Nat'l City Bank of Rome v. Busbin, 175 Ga. App. 103, 332 S.E.2d 678, 683 (1985).

[67]   Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C., 426 F. Supp. 2d 1356, 1372 (N.D. Ga. 2006) (Thrash, J.).

[68]   Id.

[69]   Compl. ¶ 129 (emphasis added).

### C. Breach of Contract (Count 10)

Lastly, the Defendants move to dismiss the United States' breach of contract claim. To adequately plead breach of contract under federal common law, one must allege "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."[70] Both parties agree that there were contracts between the parties. The parties also agree that PV Contracts required PWC to invoice the correct price and to return discounts which were directly attributable to the contracts.

PWC's main argument is that the Complaint does not sufficiently plead that PWC breached the contracts, either by using The Sultan Center's invoice price or by keeping any discounts. But for the same reasons discussed previously, the Court disagrees. The Complaint alleges that PWC inappropriately withheld discounts from the United States and called them "prompt payment" discounts in an attempt to avoid its duty to pass them along to the government. The Complaint also alleges that PWC inappropriately used inflated invoices from The Sultan Center which, in conjunction with the discount scheme, was calculated to overcharge the government and split the extra margin with its "suppliers." The latter allegations depend on what the contracts

---

[70]     Hernandez-Rodriguez v. Al Sun Prot., Inc., No. 09-23057-CIV, 2010 WL 996529, at *2 (S.D. Fla. Mar. 17, 2010).

mean by "manufacturer/supplier," an interpretation which, as discussed previously, the Court is unable to reach at this stage. However, regardless of the outcome of that interpretation, there is no doubt that the Complaint sufficiently alleges that the PWC retained discounts it should not have. For these reasons, dismissal of the breach of contract claim is not warranted at this time.

## IV. Conclusion

For the foregoing reasons, the Defendants' Motions to Dismiss [Docs. 163-1 & 182] are GRANTED in part and DENIED in part.

SO ORDERED, this 16 day of March, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge