IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA Ex
Rel, et al.,


v.                                    CIVIL ACTION FILE
                                       NO. 1:05-CV-2968-TWT

THE PUBLIC WAREHOUSING
COMPANY K.S.C.
also known as
Agility, et al.,

  Defendants.

**OPINION AND ORDER**

This is a qui tam action.  It is before the Court on the Defendants The Sultan

Center Food Products Co., K.S.C., Emad Al-Saleh, Charles Tobias Switzer, Tarek

Abdul Aziz Sultan Al-Essa, and The Public Warehousing Company, K.S.C.'s

Motions to Dismiss the Relator Kamal Mustafa Al-Sultan's Complaints pursuant to

Rules 9(b) and 12(b)(6) [Docs. 196, 197, 201, 202 & 205]. For the following reasons,

The Sultan Center's Motion to Dismiss based on Rules 9(b) and 12(b)(6) [Doc. 196]

is DENIED in part and GRANTED in part, The Sultan Center's Motion to Dismiss

Based on United States' Notice of Election to Intervene [Doc. 197] is DENIED as

moot, Al-Saleh's Motion to Dismiss [Doc. 201] is GRANTED, Switzer's Motion to Dismiss [Doc. 202] is GRANTED, and Al-Essa and PWC's joint Motion to Dismiss [Doc. 205] is GRANTED in part and DENIED in part.

## I. Background

According to the Relator's Complaint, First Amended Complaint, and Second Amended Complaint, The Public Warehousing Company, K.S.C. ("PWC") entered into three contracts between May 2003 and July 2005 with the Defense Supply Center Philadelphia, an agency of the Department of Defense.[1] The purpose of the contracts was to provide food and other subsistence items to American soldiers in Iraq and elsewhere in the Middle East. The Relator alleges that the Defendants falsely billed the United States on the three contracts by falsely inflating invoices and by withholding discounts they were obligated to pass along to the government.

### A.     The Parties

The Plaintiff-Relator Kamal Mustafa Al-Sultan is a resident of Kuwait. He is also the General Manager and controlling shareholder of Kamal Mustafa Al-Sultan Company, WLL ("Al-Sultan Company"), a limited liability Kuwaiti trading company that has had arrangements with the United States and the Defendants. The Defendant

---

[1]      Relator's Compl. ¶ 12 [Doc. 1] (the "Complaint"). The Defense Supply Center is the troop support center agency of the Defense Logistics Agency itself a logistics combat support agency within the Department of Defense.

PWC is a large, publicly traded Kuwaiti logistics company now known as Agility Public Warehousing Company K.S.C. PWC is headquartered in Sulaibiya, Kuwait. The Sultan Center Food Products Co., K.S.C. is a provider of various perishables and consumer goods, also headquartered in Kuwait, which PWC used to fulfill many of its orders related to the contracts at issue.[2]

The Defendant Tarek Abdul Aziz Sultan Al-Essa is an American citizen who served on the boards of both PWC and The Sultan Center, and was PWC's Board Chairman and Managing Director. The Defendant Charles Switzer is a citizen of the United States who was PWC's General Manager of the Prime Vendor Program, which oversaw PWC's contracts with the Defense Supply Center. And lastly, the Defendant Emad Al-Saleh is an American citizen who served as an employee of PWC.[3]

### B.    The Contracts

The Defense Supply Center issued a solicitation for the first contract, known as the PV-1 Contract, on May 10, 2002.[4] In July of 2002, the Al-Sultan Company and PWC entered into a Partnership Agreement in which they agreed to jointly pursue the PV-1 Contract. The Partnership was to be governed by three board members, two of

---

[2]    Id. at ¶¶ 3-5.

[3]    Id. at ¶¶ 6-8.

[4]    Id. at ¶ 14.

whom would be appointed by PWC and one by the Al-Sultan Company.[5] PWC nominated the Defendants Switzer and Al-Saleh as its designees, and the Al-Sultan Company appointed the Relator.[6] According to the terms of the Partnership Agreement, PWC would control the bid and the contract, but the Al-Sultan Company would be responsible for coordinating the acquisition of the supplies themselves.[7] PWC submitted a bid for the PV-1 Contract, which was accepted and entered into with an effective date of May 28, 2003.[8] It required PWC to acquire and distribute subsistence items to U.S. military personnel located in Kuwait, Qatar, and Iraq.[9] PWC was eventually awarded two more contracts, known as the PV-II Contract and the PV-Bridge Contract.[10] In total, the Complaint alleges that the total value of the contracts exceeded $16 billion.[11]

All three contracts contained the same contractual language regarding how PWC was to invoice the Defense Supply Center. Under the contracts, PWC was to

---

[5]    Id. at ¶ 22.

[6]    Id.

[7]    Id. at ¶¶ 17-21.

[8]    Id. at ¶ 25.

[9]    Id. at ¶ 15.

[10]    Id. at ¶ 28.

[11]    Id.

invoice the "unit price" for each product delivered. This was comprised of two components: "delivered price" and "distribution price." The "delivered price" was the cost of goods paid by the "manufacturer/supplier" to get the product to a distribution point. The "distribution price" was supposed to be the "delivered price" plus a fixed fee set by PWC which covered all of its overhead, transportation expenses, etc. The only variable cost which could change, therefore, was the actual amount invoiced by a "manufacturer/supplier" to deliver the product. The contracts also required PWC to turn over to the Defense Supply Center any rebates or discounts it received as a direct result of the contracts.[12]

### C.    The Alleged Schemes

The Relator primarily alleges that the Defendants colluded to overcharge the government by using The Sultan Center as a middleman to increase the price paid by the government. The contracts required PWC to purchase perishable goods on the local market, products called Local Market Ready Items or LMRI. When PWC received orders from the Defense Supply Center for these local market items, PWC typically called upon the Defendant The Sultan Center to fulfill them. The Sultan

---

[12]    Id. at ¶¶ 29, 59.

Center would then purchase the LMRI from local producers and invoice the cost to PWC.[13]

The Complaint states, however, that The Sultan Center substantially marked up the prices it had paid local manufacturers and suppliers for the LMRI. Rather than invoice PWC solely for the "cost of goods," The Sultan Center would add its own overhead and profit. According to the Complaint, the Defendants knew that the prices were inflated, and knew the price The Sultan Center had actually paid, but billed the Defense Supply Center at the inflated price. The Relator argues that because The Sultan Center was not adding anything of value to the contract other than serving as a middleman for the purpose of enriching itself, the Defendants were deliberately structuring their invoices so as to defraud the government.[14]

Soon after the PV-1 Contract had been entered into, PWC and The Sultan Center allegedly attempted to reach an agreement with the Al-Sultan Company and the Relator to participate in the scheme. The Relator refused to participate, and presented a counteroffer that the Relator and the Al-Sultan Company believed was in accordance with the terms of the PV-1 Contract. When PWC and The Sultan Center refused the Relator's counteroffer, the Complaint alleges that PWC transferred

---

[13]      Id. at ¶¶ 32-58.

[14]      Id. at ¶ 60.

responsibility for the supply of LMRI from the Relator and the Al-Sultan Company to The Sultan Center.[15]

The Relator also argues that the Defendants participated in a "kickback" scheme, in which PWC would receive discounts that were deceptively described as "prompt payment" discounts. According to the Relator, the Defendants had agreements with various vendors for discounts ranging between 3% and 8.5%. The parties would call these discounts "prompt payment discounts," stating that they were given to PWC for paying its bills earlier than required. Because of that, the Defendants argue that the payments were not directly attributable to the PV Contracts, and, therefore, they did not have to report them to the United States. The First Amended Complaint alleges, however, that often these discounts were given out regardless of whether payments were made early, and that the Defendants pursued this scheme as a way to increase their margins.[16]

### D.    Procedural History

The Relator, Kamal Mustafa Al-Sultan, initially filed this *qui tam* case in November 2005. The Relator then filed amended complaints on September 25, 2006 and October 1, 2009. In his complaints, the Relator alleged ten different counts against

---

[15]     Id. at ¶¶ 32-39.

[16]     Relator's First Amended Compl. ¶¶ 98-109.

all of the Defendants. Counts 1-3 and 7-9 are all claims under the False Claims Act. Counts 4-6 are common law claims, and Count 10 contains the alleged damages.

On November 13, 2009, the United States elected to intervene in part and declined to intervene in part. The United States intervened as to the claims against PWC and The Sultan Center relating to the inflated prices and unreported discounts PWC allegedly claimed. The United States originally stated an intention to intervene as to the Defendant Al-Essa, but subsequently declined to include Al-Essa in either of its filed complaints. The United States did, however, expressly declined to intervene against the Defendants Switzer and Al-Saleh. The Defendants now move to dismiss the Relator's Complaint, First Amended Complaint, and Second Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

### III. Discussion

#### A.    PWC, The Sultan Center, and Al-Essa

PWC, The Sultan Center, and Al-Essa argue that the Relator's claims against them should be dismissed because of the United States' intervention. Different courts have taken different approaches on the issue of what happens to a relator's complaint after the government intervenes. Many courts have simply dismissed the complaint

altogether.[17] These courts generally take the view that "[o]nce the Government intervenes...Relator has no separate free-standing FCA cause of action,"[18] relying primarily on a case decided in 1998 by the Ninth Circuit.[19] Often missed in these opinions, however, is the Supreme Court's opinion two years later in <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>,[20] in which the Supreme Court seems to have squarely disagreed with the Ninth Circuit's reasoning. In that case, the Supreme Court held "the statute gives the relator *himself* an interest in the lawsuit, and not merely the right to retain a fee out of the recovery."[21] The Relator clearly continues to have standing after the government has intervened under the Supreme Court's view, and as a result the Court should not dismiss his claims on that basis.

---

[17]  See, e.g., <u>U.S. ex rel. Feldman v. City of N.Y.</u>, 808 F. Supp. 2d 641, 648-49 (S.D.N.Y. 2011); <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, No. 01-12257-PBS, 2007 WL 4287572, at *4 (D. Mass. Dec. 6, 2007); <u>U.S. ex rel. Magee v. Lockheed Martin Corp.</u>, No. CIV. 109CV324HSOJMR, 2010 WL 972214, at *2 (S.D. Miss. Mar. 12, 2010).

[18]  See <u>Magee</u>, 2010 WL 972214, at *2 (S.D. Miss. Mar. 12, 2010).

[19]  <u>U.S. ex rel. Barajas v. Northrop Corp.</u>, 147 F.3d 905, 910 (9th Cir. 1998) ("A qui tam relator has Article III standing to sue only as a relator, on behalf of the government. His standing is in the nature of an assignee of the government's claim...").

[20]  529 U.S. 765 (2000).

[21]  <u>Id.</u> at 772 (emphasis added, other emphasis omitted).

In response to Stevens, some courts have simply allowed both the government's and the relator's complaints to go forward. For example, in United States ex rel. Landis v. Tailwind Sports Corp.,[22] the court refused to dismiss the relator's complaint unless the defendants could adequately show that the "the relator's 'unrestricted participation during the course of the litigation ... would cause the defendant undue burden or unnecessary expense.'"[23] The court went on to say that, "there is no presumption under the statute against allowing both complaints to proceed."[24] Under this view, the government simply becomes a plaintiff just like any other, and both the relator and the government can pursue their own theories of the case on their own facts.

But this outcome fails to give to the government the control that the statute expects it to have when it intervenes. Although the False Claims Act allows the relator to continue as a party and fully participate in the litigation, the Act also gives the United States "the primary responsibility for prosecuting the action" should the government elect to intervene.[25] The Landis court's view of two co-equal plaintiffs

---

[22]    51 F. Supp. 3d 9 (D.D.C. 2014).

[23]    Id. at 28 (quoting 31 U.S.C. § 3730(c)(2)(D)).

[24]    Id.

[25]    31 U.S.C. § 3730(c)(1).

prosecuting their own complaints does not square with the Act's vision of the United States in the driver's seat.

The third approach, and the one the Court finds the most persuasive, recognizes that a False Claims Act case fundamentally involves only one redressable injury: the government's.[26] Though multiple parties may have standing to assert the government's claims, the fact remains that only one claim exists. As a result, there can only be one overarching operative complaint. At the beginning of the case, the relator's complaint is operative. Once the government intervenes, however, "by automatic operation of the statute, the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened."[27] The government's complaint supersedes the relator's, but only as to those claims in which the government has decided to intervene. Because there remains only one overall operative complaint, the "relator's initial complaint continues to be the operative complaint for all non-intervened claims."[28] To view it another way, the government is effectively amending or editing the relator's complaint, inserting and redacting claims as it chooses. When the government has intervened, that portion of the relator's

---

[26]    See United States ex rel. Sansbury v. LB & B Assocs., Inc., 58 F. Supp. 3d 37, 47 (D.D.C. 2014).

[27]    Id.

[28]    Id.

complaint effectively ceases to exist because it has been superseded. Therefore, the appropriate action for the Court to take when a defendant moves to dismiss those portions of a relator's complaint that have been superseded by government intervention is to deny the motion as moot as it relates to the intervened claims.

In this case, the United States elected to intervene against PWC, The Sultan Center, and Al-Essa as to: "(1) submitting, causing or conspiring to submit falsely inflated claims for payment...and, (2) obtaining from various vendors in the United States, Kuwait, and elsewhere, discounts and rebates, and kickbacks, that it failed to disclose or pass through to the United States..."[29] When the government eventually filed its First Amended Complaint, it included claims against PWC and The Sultan Center for violations of § 3729(a)(1) and (a)(2) of the False Claims Act.[30] These counts are materially the same as Counts 1-2 and 7-9 of the Relator's Complaints because they involve the same operative facts, the same actors, and the same statutory basis. As the Relator's claims against PWC and The Sultan Center based on § 3729(a)(1) and (a)(2) are duplicative, they are superseded by the government's

---

[29]   The United States Notice of Election to Intervene, in Part and to Decline to Intervene, in Part, at 2 [Doc. 65].

[30]   United States' First Amended Compl. in Intervention, at 40-46 [Doc. 78].

complaint. PWC's and The Sultan Center's motions to dismiss Counts 1-2 and 7-9 of the Relator's Complaints are therefore denied as moot.

The government's First Amended Complaint did, however,  differ from its intervention notice in two substantial ways: (1) it made no mention of conspiracy or any claims under § 3729(a)(3), and (2) it did not include any claims against Al-Essa. The first issue, then, is whether the relator's claims are superseded by the government's notice of intervention or by the complaint the government eventually files. In the Court's view, it is clear that the government's complaint, not the notice of intervention, supersedes the Relator's Complaint. To hold otherwise would preclude a relator from moving forward in a situation where the government had expressed an intention to intervene but failed to actually do anything. As a result, though the government expressed its intention to intervene as to the claims against the Defendant Al-Essa and the count of conspiracy, the fact that neither were included in the government's First Amended Complaint means that they were not superseded and the Relator can continue to proceed accordingly.[31]

PWC and The Sultan Center still argue, however, that the Relator's conspiracy claim should still be dismissed. First, the Defendants argue that a § 3729(a)(3) conspiracy claim is duplicative of the government's other claims because it depends

---

[31]    The remaining claims against Al-Essa are dealt with later in this Opinion.

on the viability of the underlying FCA claims – claims which have since been superseded by the government.  It is true that FCA conspiracy claims are viewed the same way as traditional conspiracy claims, and as such are not independent causes of action.[32] But the Relator's conspiracy claim does not need to rest solely on the *Relator's* Complaints.  Whether a claim resides in a government or relator complaint is irrelevant. As the Court discussed above, the way to view an FCA case is as if there is one overarching operative complaint in the abstract, in this case consisting collectively of the government's First Amended Complaint and the Relator's Complaints. Accordingly, because the United States continues to allege violations of the FCA, the Relator's conspiracy claim can continue to rest on those underlying claims.

Alternatively, the Defendants argue that the Relator fails to plead the conspiracy claim with sufficient particularity. To state a claim of conspiracy under § 3729(a)(3), the Relator:

> must show (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the

---

[32]     See U.S. ex rel. Coppock v. Northrup Grumman Corp., No. CIV.A. 3:98-CV-2143, 2003 WL 21730668, at *14 n.17 (N.D. Tex. July 22, 2003) ("Liability for conspiracy under the FCA is governed by traditional notions of civil conspiracy.") (citing United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir.1991)).

conspiracy; and (3) that the United States suffered damages as a result
of the false or fraudulent claim.[33]

The Relator's allegations must also be pleaded with particularity in satisfaction of

Rule 9(b)'s requirements.[34] There is no question that the Relator's Complaint

sufficiently alleges both overt acts by the alleged conspirators and damages to the

United States.[35]

        The only issue is whether the Relator sufficiently alleges that there was an

agreement among the Defendants. The Defendants argue that the Complaint alleges

nothing more than a proposal, and that the Complaint never specifically alleges that

an agreement was actually reached. But the Defendants misread the Complaint. Of

course an agreement was not reached between the Defendants and the *Relator*; after

all, he is not alleged to have participated in the fraudulent schemes. The issue is

whether there was an agreement among the *Defendants*. The very fact that the

Defendants proposed the scheme to the Relator, and then declined to work with him

after he refused to agree to it, shows that there was an agreement between PWC and

---

        [33]     Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (citations
omitted).

        [34]     Id.; see also Fed. R. Civ. P. 9(b).

        [35]     See, e.g., Relator's Compl. ¶¶ 43, 61.

The Sultan Center.[36] The Complaint also goes on to state that there was an "unlawful arrangement that was struck among the Defendants."[37] This is enough to satisfy the particularity requirements of Rule 9(b). Therefore, PWC's and The Sultan Center's Motions to Dismiss Count 3 of the Relator's Complaint are denied.

### B.    False Claims Act Claims Against Individual Defendants: Al-Essa, Al-Saleh, and Switzer

The Relator's Complaint lists three counts against the individual Defendants for violations of the False Claims Act: (1) presentment of false claims under § 3729(a)(1), (2) use of false statements under § 3729(a)(2), and (3) conspiracy to violate the False Claims Act under § 3729(a)(3). As discussed above, the conspiracy claim fundamentally depends on the viability of the first two counts. Because the Relator has failed to plead his allegations against the individual Defendants with any particularity, all claims against Al-Essa, Al-Saleh, and Switzer must be dismissed.

In its Order addressing PWC's and The Sultan Center's motions to dismiss the United States' complaint, the Court already determined that the alleged schemes, taken as true, would violate § 3729(a)(1) and (a)(2). The only question here is the individual Defendants' role in those schemes. The Relator's Complaint sheds little

---

[36]    See id. at ¶¶ 32-41.

[37]    Id. at ¶ 41.

light. The Complaint only mentions Al-Essa  in seven paragraphs, the allegations of which can be summed up as: (1) Al-Essa is a Kuwaiti citizen, (2) is the Board Chairman and Managing Director of PWC, (3) has been on the Board of The Sultan Center, (4) was on the Board of the Partnership, and (5) along with his immediate family members, is a controlling shareholder of The Sultan Center.[38] Switzer is only mentioned in four paragraphs, which describe nothing more than his identity, his role as manager of the contracts for PWC, and that he "knew about" the schemes.[39] Al-Saleh is mentioned even less, with his name appearing in only three paragraphs of the Relator's Complaint.

All told, the Relator alleges that Al-Saleh is an American citizen, "served as an employee of PWC," that he was a member of the Partnership Board, and that he also "knew" about the schemes.[40] Considered together, these allegations come no where close to the particularity required by Rule 9(b). The Complaints consistently suggest that PWC submitted false documents, but they present no allegations that the individual Defendants themselves presented the claims for payments. The Complaints

---

[38]    See Compl. ¶¶ 6, 22, 36-37, 60, 63, 75.

[39]    Id. at ¶¶ 7, 22, 76-77.

[40]    Id. at ¶¶ 8, 22, 77.

do not present the "who, what, when, where, and how"[41] of the Defendants'
participation in the schemes, and they do not put the Defendants on notice as to their
roles in the schemes.

Perhaps recognizing that the allegations against the individual Defendants are
not specific, the Relator attempts to argue that he does not need to plead the
Defendants' particular roles in the schemes as long as he can show that they were in
"control" of the entities charged with fraud. To support his argument, however, the
Relator mistakenly analogizes securities fraud cases to the case at hand. While group
pleading is allowed in certain limited circumstances,[42] it is also well established that
a corporation's shareholders or managers cannot be held liable based solely on their
title or ownership.[43] The Complaint does nothing more than say that the Defendants
violated the False Claims Act because they were in positions of authority when the

---

[41]     In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1348
(N.D. Ga. 2000).

[42]     See United States ex rel. Heater v. Holy Cross Hosp., Inc., 510 F. Supp.
2d 1027, 1036 (S.D. Fla. 2007) (considering two corporate defendants collectively
because they had an interrelated relationship where one corporate defendant managed
the other).

[43]     See, e.g., U.S. ex rel. Graves v. Plaza Med. Centers Corp., No.
10-23382-CIV, 2014 WL 5040284, at *2 (S.D. Fla. Oct. 8, 2014) (individual
defendant's role as president of defendant corporation was not sufficient to allege
FCA liability as to the individual); U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.,
115 F. Supp. 2d 35, 39 (D. Mass. 2000) ("Ownership—even total ownership—of a
corporation does not by itself impart the corporation's liabilities to the owner.").

claims were submitted. The Relator would then have the Court infer that because they had authority, the Defendants must have done something wrong too. This is insufficient.[44] Because the Complaint does not satisfy the pleading requirements of Rule 9(b) as to the §§ 3729(a)(1)-(2) claims, and because the conspiracy count depends on their viability, the individual Defendants' Motions to Dismiss the claims against Al-Essa, Al-Saleh, and Switzer are granted.

---

[44]     The Relator points to ¶ 32 of the Complaint, which states that "PWC's representatives (including the individually named Defendants)" participated in "discussions" in which PWC proposed the schemes to the Relator, as satisfying Rule 9(b)'s particularity requirement. But ¶ 32 contains nothing more than generalized group pleading, which is not enough to satisfy Rule 9(b). See Brooks v. Blue Cross Blue Shield of Florida, Inc., 116 F.3d 1364, 1381 (11th Cir. 1997) ("Therefore, in a case involving multiple defendants...the complaint should inform each defendant of the nature of his alleged participation in the fraud.") (internal citations and quotations omitted).

## C.     Relator's Common Law Claims (Counts 4-6)

In addition to alleged violations of the False Claims Act, the Relator also brings three common law claims against all of the Defendants for breach of contract, mistaken payment, and unjust enrichment. The Defendants argue that the Relator has no right to bring common law claims on behalf of the United States. The Court agrees that the Relator does not have standing as to the common law claims, and that Counts 4-6 should be dismissed.

In order to bring a claim in court, a plaintiff must have Article III standing.[45] While the False Claims Act does grant standing to a relator to assert claims for violations of the Act, it "does not give relators the right to assert common law claims on behalf of the United States."[46] The Relator's Complaint does not allege that he personally suffered an injury in fact; it alleges only that the United States has suffered injury. Because the Relator does not allege that he has suffered an injury, the Defendants' motions to dismiss the common law claims are granted for lack of standing.

---

[45]     Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) (citation and quotation marks omitted) ("a plaintiff without an injury in fact lacks Article III standing, and the federal courts do not have jurisdiction over his or her complaint.").

[46]     United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443, 452 (S.D.N.Y. 2001).

## IV. Conclusion

For the reasons discussed above, Counts 1-2 and 7-9 against PWC and The Sultan Center have been superseded by the government's intervention, while the Relator retains control of Count 3. Counts 4-6 against all Defendants are dismissed for lack of standing, and all counts against Al-Essa, Al-Saleh, and Switzer are dismissed under Rule 9(b). Accordingly, The Sultan Center's Motion to Dismiss based on Rules 9(b) and 12(b)(6) [Doc. 196] is DENIED in part and GRANTED in part. The Sultan Center's Motion to Dismiss Based on United States' Notice of Election to Intervene [Doc. 197] is DENIED as moot. Al-Saleh's Motion to Dismiss [Doc. 201] is GRANTED. Switzer's Motion to Dismiss [Doc. 202] is GRANTED. Al- Essa and PWC's joint Motion to Dismiss [Doc. 205] is GRANTED in part and DENIED in part.

SO ORDERED, this 16 day of March, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge